UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AHMED AMARA, ABDELHAMID BENKIRANE, JAMAL FAROUK, CHAKIB GHAOUTA, ZAKARIA GHAOUTA, ABDELAZIZ LAROUSSI, and RACHID TOURABI <br><br> Plaintiffs, <br><br> v. <br><br> FAIRMONT COPLEY PLAZA and FAIRMONT HOTELS AND RESORTS INC., <br><br> Defendants. | No. _____ <br><br><br> JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiffs Ahmed Amara, Abdelhamid Benkirane, Jamal Farouk, Chakib Ghaouta,

Zakaria Ghaouta, Abdelaziz Laroussi, and Rachid Tourabi, through undersigned counsel,

respectfully submit this Complaint against their joint employer Defendants Fairmont Copley

Plaza (the "Hotel") and Fairmont Hotels and Resorts, Inc. ("Fairmont Corporate"), together

("Defendants"). Defendants have unlawfully discriminated against Plaintiffs based on their

national origin, Moroccan, and religion, Muslim, in violation of Title VII of the Civil Rights Act

of 1964, 42 U.S.C. 2000e et seq., and Massachusetts General Law, Chapter 151B, § 4.

Defendant Hotel discriminated against Plaintiffs by (1) creating and tolerating a hostile work

environment where employees and managers harassed Plaintiffs based on their national origin

and religion; (2) treating Plaintiffs differently because of their national origin and religion in the

terms of their employment with regard to work assignments, discipline, and promotions and

transfers, and, in two instances, by unlawfully terminating Plaintiffs; and (3) retaliating against Plaintiffs based on their complaints about discrimination in the workplace.

Defendants perpetrated this pattern of discrimination despite Fairmont Corporate having been sued by the United States Equal Opportunity Commission ("EEOC") in 2003 for discriminating against Muslim and Arab employees at the Fairmont Plaza Hotel in New York City in the aftermath of September 11, 2001, and despite having entered into a Consent Degree in 2005, in which it agreed to pay damages and provide information and training to prevent discriminatory conduct in its hotels, including the Fairmont Copley Plaza.

Plaintiffs seek both monetary and equitable relief and request a jury trial.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1367(a).

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## PARTIES

3.      Plaintiff Ahmed Amara resides at 76 Thacher Street, Malden, Massachusetts 02148.  Plaintiff Amara has worked at the Hotel since 1995.  Plaintiff Amara was born in Morocco; he moved to the United States in 1989.  Plaintiff Amara filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination ("MCAD") in a timely manner on July 6, 2009 (MCAD No. 09BEM01682; EEOC No. 16C-2009-01860); he secured a dismissal of his charges by the MCAD on October 23, 2009, in order to pursue this civil action.

4.      Plaintiff Abdelhamid Benkirane resides at 33 Cambridge Street, Revere, Massachusetts 02151.  Plaintiff Benkirane has worked at the Hotel since 1991.  Plaintiff

Benkirane was born in Morocco; he moved to the United States in 1986. Plaintiff Benkirane filed a Charge of Discrimination with the EEOC in a timely manner on November 17, 2006 (MCAD No. 06BEM02842; EEOC No. 16C-2007-00275) and November 18, 2008 (MCAD No. 08BEM03301; EEOC No. 16C-2009-00306); he secured a right to sue letter dated July 28, 2009.

5.      Plaintiff Jamal Farouk resides at 156 Cottage Street, Apartment 6, Boston, Massachusetts 02128. In July 2008, Plaintiff Farouk changed his name from Jamal Zar-Gas to Jamal Farouk. Plaintiff Farouk worked at the Hotel from April 2005 until November 2006, when the Hotel terminated his employment. Plaintiff Farouk was born in Morocco; he moved to the United States in December 2002. Plaintiff Farouk filed a Charge of Discrimination with the MCAD in a timely manner on July 5, 2006 (MCAD No. 06BEM01601; EEOC No. 16C-2006-01718) and December 15, 2006 (MCAD No. 06BEM03058; EEOC No. 16C-2007-00431); he secured a dismissal of his charges by the MCAD on August 27, 2009, in order to pursue this civil action.

6.      Plaintiff Chakib Ghaouta ("C. Ghaouta") resides at 19 Herbert Avenue, Saugus, Massachusetts 01906. Plaintiff C. Ghaouta began working at the Hotel in June 2003. Plaintiff C. Ghaouta was born in Morocco; he moved to the United States in 2001. Plaintiffs Chakib Ghaouta and Zakaria Ghaouta are brothers. Plaintiff C. Ghaouta filed a Charge of Discrimination with the EEOC in a timely manner on April 27, 2007 (MCAD No. 01BEM01036; EEOC No. 16C-2007-01310); he secured a right to sue letter dated July 28, 2009.

7.      Plaintiff Zakaria Ghaouta ("Z. Ghaouta") resides at 24 Taft Street, Revere, Massachusetts 02151. Plaintiff Ghaouta has worked at the Hotel since July 1999. Plaintiff Ghaouta was born in Morocco; he moved to the United States in 1998. Plaintiffs Chakib Ghaouta and Zakaria Ghaouta are brothers. Plaintiff Z. Ghaouta filed a Charge of

3

Discrimination with the EEOC in a timely manner on January 16, 2007 (MCAD No. 07BEM00079; EEOC No. 16C-2007-00582) and November 17, 2008 (MCAD No. 08BEM03293; EEOC No. 16C-2009-00300); he secured a right to sue letter dated July 28, 2009.

8.      Plaintiff Abdelaziz Laroussi resides at 128 Flint Street, Apartment 1, Lynn, Massachusetts 01905. Plaintiff Laroussi worked at the Hotel from November 1997 until November 2007, when the Hotel terminated his employment. Plaintiff Laroussi was born in Morocco; he moved to the United States in 1987 to join his family. Plaintiff Laroussi filed Charges of Discrimination with the EEOC in a timely manner on November 17, 2006 (MCAD No. 06BEM02841; EEOC No. 16C-2007-00274) and January 16, 2007 (MCAD No. 07BEM00081; EEOC No. 16C-2007-00584); he secured a right to sue letter dated July 28, 2009.

9.      Plaintiff Rachid Tourabi resides at 21 Harold Street, Chelmsford, Massachusetts 01824. Plaintiff Tourabi has worked at the Hotel since 1991. Plaintiff Tourabi was born in Morocco; he moved to the United States in 1987. Plaintiff Tourabi filed a Charge of Discrimination with the EEOC in a timely manner on January 17, 2007 (MCAD No. 07BEM00097; EEOC No. 16C-2007-00598) and March 29, 2007 (MCAD No. 07BEM00768; EEOC No. 16C-2007-01113); he secured a right to sue letter dated July 27, 2009.

10.     Defendant Fairmont Copley Plaza ("Hotel") is a luxury hotel located at 138 St. James Avenue, Boston, Massachusetts 02116. The Hotel has more than 350 guest rooms and several dining establishments. The Hotel is an employer of the plaintiffs.

11.     Defendant Fairmont Hotels and Resorts Inc. ("Fairmont Corporate") is a Canadian company with headquarters located at Canadian Pacific Tower, 100 Wellington Street West, TD Centre, P.O. Box 40, Toronto, Ontario, M5K 1B7, Canada. Fairmont Corporate

operates luxury hotels worldwide and operates the Hotel. Fairmont Corporate is an employer of the plaintiffs.

12.     Upon information and belief, Defendants have common management, joint oversight of operations at the Hotel, and share management and human resources policies. For example, the General Manager (the "GM") of the Hotel, Paul Tormey, and the Human Resources ("HR") Director, Alex Pratt, are Fairmont Corporate employees. GM Tormey not only oversees the Hotel in Boston, but several other Fairmont hotels as well, including ones in Bermuda, Chicago, and New York. Likewise, HR Director Pratt is also responsible for other Fairmont hotels in Bermuda, Chicago, and New York. Fairmont Corporate executives, including Corporate HR Vice President ("VP") Carolyn Clark and Corporate Senior VP of Operations for North America Kevin Frid regularly visit the Hotel. In addition, Fairmont Corporate operates an "Ethics Hotline," which is available to Fairmont Hotel employees for the purpose of reporting complaints directly to Corporate rather than through the internal mechanisms available through the local hotel.

## FACTS

13.     Prior to joining the Hotel, Plaintiffs each had considerable experience in either the hotel or restaurant industry, and, since joining the Hotel, each individual plaintiff has received considerable recognition for his successful work performance at the Hotel. However, despite their strong work records, after the terrorist attacks of September 11, 2001, Plaintiffs became the target of persistent and severe discriminatory treatment based on their national origin and religion, including unlawful harassment, disparate treatment, and retaliation based on their complaints about discrimination in the workplace.

14.     On one occasion in mid-September 2001, Plaintiffs Amara and Tourabi were standing by an employee entrance along with a third employee Gean-Marie (LNU), who was employee Janice Tracey's niece.  Hotel security approached them and told them to move to a nearby location away from the entrance, which was an unusual request.  Gean-Marie, who is white, said, "It's because you guys are here; if you guys weren't here they would let me stay here," angrily blaming Plaintiffs' Moroccan ancestry as the basis for security's suspicion. Plaintiff Amara reported this incident to HR, but HR did nothing to assure Plaintiff Amara that Hotel security would not target Moroccan employees based on their national origin or religion.

15.     Around the same time, Doorman Billy Smith began harassing Plaintiff Amara regularly.  For example, in October 2001, Doorman Smith falsely accused Plaintiff Amara of taking excessive breaks and then escalated his hostile behavior by approaching Plaintiff Amara where he had been stationed, on the St. James Street side of the building, and grabbing Plaintiff Amara's testicles.  Fellow Doorman Steve Klein witnessed Smith making the false accusations. Shocked, Plaintiff Amara reported the incident to Don Rzeppa of Hotel security.  Later in October 2001, Smith again harassed Plaintiff Amara by teasing him about taking breaks. Manager Houston Stevens learned of the incident and called Smith and Plaintiff Amara to meet with him.  At the meeting, Smith called Plaintiff Amara "a fucking Muslim liar."  Manager Stevens told Smith to cease making the comments, but Smith ignored Manager Stevens and said sarcastically, "I've changed my mind about minorities."  Plaintiff Amara reported these incidents to HR Director Pratt, but Pratt informed him that Smith and Stevens denied that the incidents had taken place.  However, HR Director Pratt had also spoken with Doorman Steve Klein who told Director Pratt that he had observed Smith falsely accuse Plaintiff Amara of taking excessive breaks, and that he had also observed Smith make derogatory comments about Plaintiff Amara's

ancestry. Yet, even after hearing Klein's confirmation of Plaintiff Amara's complaints, HR Director Pratt still found no basis upon which to discipline Smith.

16.    The dismissive manner in which HR Director Pratt has handled Plaintiff Amara's complaint was not unusual at the Hotel. As illustrated in greater detail below, the Plaintiffs have all made repeated reports of discriminatory treatment over the next few years to HR Director Pratt, but Pratt has consistently failed to take any effective steps to correct the discriminatory environment. Furthermore, HR Director Pratt has directly contributed to the hostile and discriminatory work environment by harassing Plaintiffs and condoning the discriminatory acts of Fairmont employees and managers.

17.    Around that same time in 2001, Doorman Smith also told Plaintiff Amara to "go back home," saying, "I'm going to call immigration" and "You are an illegal alien." Plaintiff Amara complained to HR Director Pratt again, and Pratt said that he would speak to Doorman Smith. To Plaintiff Amara's knowledge, HR Director Pratt never disciplined Doorman Smith for his discriminatory behavior towards Plaintiff Amara. In contrast, years later, in 2005, when Smith had an altercation with a U.S.-born employee, the Hotel terminated his employment based on his abusive behavior.

18.    In the late fall of 2001, Doorman Kelly Jameson said to Plaintiff Tourabi, "Tell me you have nothing to do with what happened in New York," implying that Tourabi may somehow have been involved in the attacks of 9/11. Doorman Jameson later made similar comments to Plaintiff Amara.

19.    In observance of his faith, Plaintiff Tourabi typically prayed five times per day in a closet located within the Hotel. Beginning in late 2001, certain Hotel employees regularly interrupted and harassed Plaintiff Tourabi during his prayers. Specifically, server Jose Valdez

once opened the door while Plaintiff Tourabi was praying, started laughing at Plaintiff Tourabi, and called for others to gather around to watch Plaintiff Tourabi and laugh at him, all of which clearly interrupted Plaintiff Tourabi's prayers. More commonly, but still offensively, non-Moroccan employees would stand outside the closet and talk loudly while he was praying and would even make derogatory remarks about his praying.

20.    Throughout his fifteen plus tenure a Café Crew server, Plaintiff Benkirane was assigned heavier workloads by his supervisor Banquets Director Peter Shanahan compared to non-Moroccan employees under his supervision, particularly Servers Valdez and Campbell. On one occasion in 2002, the Café Crew covered two functions: a 120-person function, which usually would require three servers in the morning and one in the afternoon, and a 30-person function, which could have been handled by a single server. Servers Campbell and Valdez worked the smaller, 30-person function together, leaving Plaintiff Benkirane to work the larger, 120-person function alone. That morning, Plaintiff Benkirane reported the unfair working conditions to Manager Israel Torres, but Torres did nothing. Similarly, during downtime, when sporadic functions would arise, Director Shanahan would allow Valdez and Campbell to remain on break rather than have them tend to the event, often leaving Plaintiff Benkirane to staff the job alone.

21.    Plaintiff Laroussi joined Plaintiff Benkirane as a Café Crew server in 2002. When a full time position opened with Banquets in 2001, Plaintiff Laroussi had applied for the position. However, the Hotel instead hired Kelvin Horesely, a friend of Director Shanahan who previously worked at the Meridian Hotel. Plaintiff Laroussi filed a grievance because the Hotel had hired Horesely from outside the Hotel, rather than Plaintiff Laroussi, who was already a Hotel employee with four years of seniority and previous server experience. Eventually, after

the filing of the grievance and countless discussions and negotiations with the union, the Hotel allowed Plaintiff Laroussi to transfer from the restaurant to the Café Crew, which operates within Banquets.

22.    After joining the Café Crew in 2002, Plaintiff Laroussi immediately began experiencing negative treatment similar to that of Plaintiff Benkirane, including discriminatory comments, aggressive behavior, and generally disparate treatment.

23.    Shortly after Plaintiff Laroussi had joined the Café Crew, Plaintiffs Benkirane and Laroussi were working a busy function. In the midst of performing his work, Plaintiff Laroussi walked by the employee break room where he saw Server Valdez sitting and watching television rather than assisting with the heavy workload. Plaintiff Benkirane became frustrated, as Server Valdez often skirted his work duties, forcing Plaintiff Benkirane to cover Valdez's share of the workload. Plaintiff Benkirane saw Head of Security Shane Harrington and asked him to come witness Valdez sitting in front of the television when he should have been helping Plaintiffs Benkirane and Laroussi. After observing Server Valdez, Harrington accompanied Plaintiff Benkirane to report Valdez's behavior to HR Director Pratt. Pratt exploded at Plaintiff Benkirane, and, referring to Plaintiffs Benkirane and Laroussi, said, "You are liars, and the next time you will be fired," even though Harrington verified that Plaintiffs Benkirane and Laroussi were obviously not lying. After this incident, Server Valdez would often make discriminatory comments to Plaintiff Benkirane, such as "You Muslims stink" and "Go brush your teeth." Plaintiff Benkirane filed a grievance report with HR, but HR failed to discipline Valdez or even conduct any investigation.

24.    The disparate workload in the Café Crew was most severe for Plaintiff Laroussi. The Hotel assigned three workers to the Café Crew's morning shift – Messrs. Benkirane, Valdez,

and Campbell – but only one worker, Plaintiff Laroussi, to the Café Crew's afternoon and evening shift. As a result, Plaintiff Laroussi had a far heavier workload than the other employees. Plaintiff Benkirane and Plaintiff Laroussi complained to Banquets Director Shanahan that Plaintiff Laroussi's workload was too heavy, but Shanahan did nothing to correct the situation. As a result, over the span of approximately one year, Plaintiff Benkirane began to stay at work after his own shift had ended to assist Plaintiff Laroussi with his responsibilities. Servers Valdez and Campbell would deride Plaintiff Benkirane for assisting Plaintiff Laroussi by making comments, such as, "You're helping him because he's Moroccan." Seemingly out of spite, in November of 2007, after many years of Plaintiff Laroussi's complaining about the unfair imbalance of the workload to Director Shanahan and HR Director Pratt, and after aggressive union intervention in the matter, the Hotel implemented a new shift system that distributed work more equitably among the Café Crew workers. Unfortunately for Plaintiff Laroussi, the intervention came too late. The Hotel fired him immediately before his new shift schedule would have taken effect.

25.    Plaintiff Laroussi also experienced negative treatment from other Hotel employees. On July 10, 2002, after Plaintiff Laroussi returned from a vacation, Food and Beverage Director Thomas Meding and HR Director Pratt told Plaintiff Laroussi that the Hotel was a much quieter and better place when he was not there, clearly intending to make Plaintiff Laroussi feel unwelcome at the Hotel. Plaintiff Laroussi filed a grievance requesting that Hotel management stop creating a hostile work environment. Unsatisfied with the Hotel's response, he also filed an MCAD complaint. HR Director Pratt, who had participated in making Plaintiff Laroussi feel unwelcome, responded to the grievance by writing to Union Business Agent Gildo DiMambro, denying that the conduct grieved was inappropriate, accusing Plaintiff Laroussi of

"choosing to take offense" to Meding's comments, and of displaying "erratic behavior during the [grievance] meeting." Pratt wrote to DiMambro, "As you witnessed during our grievance meeting . . . Aziz [Laroussi] demonstrated erratic behavior during the meeting and clearly got off track again . . . ." Further, HR Director Pratt suggested that Plaintiff Laroussi should obtain "psychological evaluation." DiMambro rejected HR Director Pratt's characterization of Plaintiff Laroussi's behavior and instead questioned the conduct of Messrs. Pratt and Meding. In a letter responding to HR Director Pratt, DiMambro told Pratt that he did not find Plaintiff Laroussi's behavior erratic and that, to the contrary, he had witnessed "managers raising their voices and walking out of grievance meetings, including Mr. Meding." DiMambro suggested that Director Pratt's response to Plaintiff Laroussi's grievance was delayed and that he seemed to have only responded because Plaintiff Laroussi had recently filed discrimination charges against the Hotel at the MCAD. DiMambro concluded the letter by reminding Director Pratt that the Hotel had acknowledged Plaintiff Laroussi's quality work performance on several occasions, thus evidencing his competence as a Hotel employee. Out of fear of retaliation, Plaintiff Laroussi did not pursue his MCAD claim at that time.

26.    In 2002, Front Desk Director Tom Rice began giving Plaintiff Amara a more difficult time with scheduling, often taking shifts away from him without explanation. For example, Plaintiff Amara had secured two full time days as doorman since 1998, and Director Rice switched Plaintiff Amara's shifts to "door help," which was essentially a demotion from his position as Doorman.

27.    On July 13, 2002, Director David Jameson, without basis, told Plaintiff Amara that "he's lucky to have a job and should have been terminated a long time ago."

28.    On July 24, 2002, Manager Ruben Estrada accused Plaintiff Laroussi of stealing money in a transaction with a customer. However, on the day of the alleged theft, July 22, Plaintiff Laroussi was not at work. Plaintiff Laroussi filed a grievance. After it became apparent that the accusation was false, Beverage Director Meding told Plaintiff Laroussi, "We'll get you another time." When Plaintiff Laroussi further complained of his treatment, HR Director Pratt told him, "We didn't punish you . . . so why are you worried?" Despite Manager Estrada's false accusation against Plaintiff Laroussi, the Hotel did not discipline Estrada.

29.    On December 13, 2002, the Hotel selectively sent out an "Immigration Update" that addressed new federal immigration regulations. The substance of the notice was strictly directed towards individuals who were *non-residents*. However, the Hotel selectively sent the notice to all of the Moroccans working at the Hotel, including Plaintiffs, despite the fact that the Hotel knew that Plaintiffs had either permanent residence status or full citizenship and that the "Update" therefore did not apply to them. Plaintiffs and others filed a grievance on December 13, 2002, and sought a written apology, but the Hotel did not respond with a formal apology until more than six months later, on May 26, 2003. In the process of resolving the issue, HR Director Pratt claimed that he had "lost" the copies of the Moroccan employees' passports; this explanation is suspect because only the Moroccan employees' passports were claimed to have been "lost," and none other.

30.    In 2003, while in the men's locker room, Doorman Kelly Jameson, who had harassed Plaintiff Tourabi in the past, cornered Plaintiff Tourabi near his locker and said, "I want you to look me in the eye and tell me you are not a terrorist," and he proceeded to tell Plaintiff Tourabi about a television program that he had recently seen regarding "sleeper cells" in the U.S. that harbored individuals who planned to "blow themselves up" in acts of domestic terrorism.

This conversation frightened Plaintiff Tourabi, who at that time assured Doorman Jameson that he was a U.S. citizen and that he would never engage in any such activity. Doorman Jameson responded to Plaintiff Tourabi in disbelief, "But you are a Muslim." As Anas Laroussi started approaching them to access his locker, which was located near Plaintiff Tourabi's, Doorman Jameson quickly left. Plaintiff Tourabi reported this incident to Banquets Director Shanahan. Shanahan told Plaintiff Tourabi that he would investigate the matter, but no action was taken against Doorman Jameson.

31.    On March 15, 2003, Banquets Waiters Barbara Itri and Ralph Gramazio had been working a busy event with Plaintiff Laroussi. Itri and Gramazio had been working two specially designated tables, which guaranteed an extra tip for them. Plaintiff Laroussi was in the process of cleaning and tending to one of his own tables when Gramazio asked him to carry food to one of Gramazio's tables. Plaintiff Laroussi told Gramazio that he was unable to help him at that moment and that delivering the food to Gramazio's table was not his responsibility. Indeed, the manager on duty could have disciplined Plaintiff Laroussi for tending to the other table if his own tables' service had suffered as a result. After Plaintiff Laroussi declined to assist Gramazio, Itri intervened and falsely told Plaintiff Laroussi that he was not doing his job. Gramazio then said to Aziz, "You're an asshole and you should go back to your country. You should never say no; that's why management doesn't like you." Plaintiff Laroussi filed a grievance, and the Hotel directed Gramazio to apologize, but no further action was taken.

32.    On March 17, 2003, Plaintiff Amara was covering a shift as doorman, which he had done since 1998. Plaintiff Amara asked management, in front of Jim Doherty and Doorman Klein, if he could keep the shift permanently. Plaintiff Amara's request was denied. John

Flahnery, who had worked that shift in the past but had less seniority than Plaintiff Amara, made the same request and was granted the shift instead.

33.    In 2003, Plaintiff Amara requested leave for April 21, 22, and 23, because his wife was due to deliver on April 22. Plaintiff Amara's wife had recently had a miscarriage, so he wanted to ensure that he would be available to tend to her needs whenever she went into labor. Despite his knowledge that Plaintiff Amara wanted these dates off because his wife was due to deliver on April 22, Front Desk Director Rice denied Plaintiff Amara's request and threatened to terminate him by stating, "If you don't show up, you don't work here." Plaintiff Amara was particularly frustrated because his wife's due date, April 22, fell on a Tuesday, and for 22 consecutive weeks, though he would periodically cover shifts on Tuesdays, he had never been scheduled to work on a Tuesday as it was his day off. Further, he had seniority over the individuals whom Manager Rice had allowed to take the day off instead. On Tuesday, April 22 at approximately 3:00 pm, towards the end of his shift, Plaintiff Amara approached Manger Rice and reminded him that it was his wife's due date and requested to leave work early, but Manager Rice refused. Plaintiff Amara's wife went into labor that day, as expected, at approximately 5 pm, while Plaintiff Amara was at work. Plaintiff Amara's wife called the Hotel concierge to inform Plaintiff Amara that her labor had started, but she was unable to reach Plaintiff Amara. When his shift ended at 5:30 pm, Plaintiff Amara discovered that his wife was at home and in the midst of labor. He rushed home and then rushed his wife to the hospital. The following week, Manager Rice did not schedule Plaintiff Amara for a Tuesday shift. After this incident, Plaintiff Amara complained to HR Director Pratt, but Pratt took no action against Manager Rice.

34.    On August 30, 2003, Plaintiff Amara was working as a doorman and, as part of his responsibilities, he assisted guests with parking their vehicles. Per usual, Plaintiff Amara

gave a guest's vehicle keys to one of the valets. Later in the day, when the guest attempted to retrieve the vehicle, the keys were missing. Plaintiff Amara had performed his job appropriately by delivering the keys to a valet, but he was unable to recall which valet had taken the keys from him because the hotel's vendor, Ultimate Valet, had recently hired several new valet workers and Plaintiff Amara was not familiar with each of them. The situation was unfortunate, but not unusual. In the course of handling the keys of thousands of cars each year, doormen and valets occasionally lose sets of keys. Plaintiff Amara did not lose the keys in this circumstance, but he was unable to assist in retrieving the keys as he could not recall which valet had taken them. Front Desk Assistant Manager Patrick (LNU) issued Plaintiff Amara a warning. Plaintiff Amara complained to HR Director Pratt about the warning because fellow Doorman Manganaro, who is U.S.-born, had lost a set of keys recently as well, but the Hotel did not issue Manganaro a warning. HR Director Pratt's response was simply, "He lost the keys to a Toyota; you lost the keys to a Mercedes." Months later, on October 1, 2003, Doorman Klein, also U.S.-born, lost the keys to a Volvo, yet he, like Doorman Manganaro, received no warning.

35.    On September 13, 2003, Plaintiff Laroussi reported to work with Server Campbell at 4:30 am to begin preparing for a large event. There were approximately 225 people waiting in the room for service, so Messrs. Laroussi and Campbell started preparing breakfast in the kitchen, which included brewing pots of coffee. Server Valdez came in late, as he often did, and abruptly dumped the coffee out that Plaintiff Laroussi had prepared, falsely claiming that it was cold. Plaintiff Laroussi questioned Valdez as to why he had dumped the coffee without discussing the matter with him first, especially since it would take an additional half hour to brew another pot. Campbell, who was not a supervisor, intervened and said, "He's right, he's right," referring to Valdez. Valdez escalated the situation by telling Plaintiff Laroussi that he

was an "asshole." Plaintiff Laroussi warned Valdez and Campbell that he was going to file a grievance if their aggressive behavior did not cease.

36.    As a result of Plaintiff Laroussi legitimately threatening to file a grievance against Campbell and Valdez for their hostile behavior on September 13, 2003, Campbell, without any basis, falsely reported to Scott (LNU), the Director of Security, that Plaintiff Laroussi had physically threatened him. Security Director Scott (LNU) took the matter to the Hotel's HR department. Campbell claimed that he perceived Plaintiff Laroussi's behavior as threatening and that he was scared of Plaintiff Laroussi because Plaintiff Laroussi is an "Arab." When HR asked Campbell for witnesses, Campbell provided the names of Augusto, a cook, and Joel, a dishwasher. However, both of the witnesses that Campbell had named refused to corroborate Campbell's baseless claims. In the midst of HR's sham investigation, Campbell and Valdez mocked and threatened Plaintiff Laroussi. Valdez told Plaintiff Laroussi that he was going to "cut him into pieces" or make him "disappear like Jimmy Hoffa." Campbell said of Plaintiff Laroussi, "He's Arab," and that with "one phone call to the police . . . they would send them to Guantanamo." Shockingly, the Hotel suspended Plaintiff Laroussi based on Campbell's grievances. After extensive discussions and complaints from Plaintiff Laroussi, the grievances and suspensions were eventually removed from Plaintiff Laroussi's record. Servers Valdez and Campbell were also suspended but neither served their suspension time, and the Hotel took no further disciplinary against them.

37.    On September 30, 2003, the EEOC initiated an action (the "New York Action") against Defendant Fairmont Corporate, Fairmont Hotel Management LP, and one of its hotels in New York—the Plaza Hotel—alleging discrimination on the basis of religion and national origin in violation of Title VII and Title I. See *Equal Employment v. The Plaza Hotel, et al.*, 1:03-cv-

07680-LTS-FM (SDNY Sept. 30, 2003).  The individual aggrieved plaintiffs in the New York

Action were, like the ones in this current action, Muslim and/or Arab, and were allegedly

similarly subjected to discrimination and harassment.  For example, the individual plaintiffs in

the New York Action alleged that Fairmont employees subjected them to epithets in the wake of

the terrorist tacks of September 11, 2001, such as "Taliban" and "terrorist."  The New York

Action culminated in a consent decree, in which the defendants in that action were ordered to

perform certain remedial actions, much of which, upon information and belief, applied not only

to Fairmont's Plaza Hotel in New York, but to Fairmont's Defendant Copley Plaza in Boston as

well.  Specifically, in addition to paying damages, the consent decree required the defendants to

distribute a summary of their Discrimination and Harassment Prevention Policy (the "Policy") to

employees, which consisted of:

> (a) a clear explanation of prohibited conduct; (b) the assurance that employees
> who make complaints of discrimination or provide information related to such
> complaints will not be retaliated against; (c) a clearly described complaint process
> that provides accessible avenues of complaint; (d) the assurance that Fairmont
> will accept any and all complaints from employees who wish to file internal
> complaints; (e) the assurance that Fairmont will protect the confidentiality of
> complaints to the extent possible; (f) a complaint process that provides a prompt,
> thorough, and impartial investigation; (g) the assurance that Fairmont will take
> immediate and appropriate corrective action when it determines that
> discrimination has occurred; and (h) an assurance that Fairmont will inform
> complainants of the outcome of  investigations within a reasonable amount of
> time.

See *E.E.O.C. v. Plaza Operating Partners, Ltd.*, 03 CV 7680 (S.D.N.Y. 2004) (Consent Decree).

Additionally, the Consent Decree required the defendants to provide training on the Policy,

consisting of three days of workshops for human resources staff that conduct discrimination and

harassment training, eight hours for managers and supervisors every two years for the duration of

the Consent Decree, four hours for non-managerial employees every two years, and 30 minutes

for new employees during their initial orientation.  All defendants in the New York Action,

including Defendant Fairmont Corporate named in the current action, were further enjoined from future retaliation and discrimination on the basis of national origin or religion. Additionally, upon information and belief, HR Director Pratt, whom Plaintiffs have identified in this action as condoning or even encouraging discriminatory practices at the Hotel, was responsible, at least in part, for overseeing operations at the Plaza Hotel in New York when that suit was brought.

38.    On November 17, 2003, Plaintiff Amara filed his first Charge of Discrimination with the MCAD, alleging that the Hotel had discriminated against him based on his national origin. At that time, Plaintiff Amara had an impeccable work record with no legitimate disciplinary actions taken against him. Doorman Klein supported Plaintiff Amara by complaining to the Labor Board, The American Arab Anti-Discrimination Committee ("ADC"), and the American Civil Liberties Union (the "ACLU") about abusive and unfair behavior towards Plaintiff Amara.

39.    Shortly after Plaintiff Amara filed his November 2003 Charge of Discrimination with the MCAD, HR Director Pratt met with Bellmen Ted McCarthy, Yonas Hailmicheal, and Joe Ryan to concoct an absurd scheme alleging that Plaintiff Amara had taken a larger share of the workload than he should have and that, as a result, he had unfairly earned more tips than his co-workers. This story was completely false and lacked all plausibility. Had Plaintiff Amara engaged in any such scheme, his fellow employees would have immediately complained to HR, and HR would have immediately ceased any such practice. As is apparent from the allegations contained in this Complaint, Plaintiff Amara was not a favored employee at the Hotel and would not have been permitted such preferential treatment. In fact, much to Plaintiff Amara's frustration, his fellow employees often took excessive breaks, thus requiring Plaintiff Amara to cover their share of work responsibilities. To the extent that Plaintiff Amara took on an uneven

share of the collective workload, he did so because his fellow employees were absent from the floor more often than he was. Had Plaintiff Amara not picked up the slack that his fellow employees had created, he would have been berated by his supervisors for not adequately tending to guests' needs.

40.     In December 2003, the Hotel used various incentives to reward the witnesses participating in the scheme to sully Plaintiff Amara's otherwise impeccable work record. The Hotel issued a promotion to Yonas Hailmichael on December 11, one week before the Hotel issued his false statement regarding Plaintiff Amara unfairly taking on too much work. The Hotel, in retaliation against Doorman Klein, who had defended and supported Plaintiff Amara, demoted him from doorman to bellman and took away his seniority, which the Hotel gave to Hailmichael who had less seniority than Klein. Ted McCarthy gave a statement against Plaintiff Amara on December 12, 2003, and the Hotel named him Employee of the Month on December 15.

41.     In December 2003, after Plaintiff Amara heard rumors about the Hotel's scheme, he called Assistant Manager Patrick (LNU) to address the issue. Patrick confirmed that when another bellman is "off the carpet," the remaining bellmen in the lobby must assume his duties. Patrick refused to provide Plaintiff Amara with a written statement to that effect. Shortly thereafter, presumably unrelated to these events, Fairmont Corporate transferred Patrick to a Canada site. When Doorman Klein saw Patrick in Canada in years later, Patrick apologized to Klein about Klein's demotion and told Klein that Hotel management had given him orders to change the scheduling.

42.     The Hotel's extreme reaction to his Charge of Discrimination made Plaintiff Amara fear that he would lose his job.  As a result, Plaintiff Amara dropped his MCAD Charge altogether.

43.     On December 14, 2003, shortly after United States military forces captured former Iraqi dictator Saddam Hussein, Restaurant Manager Michael Gluckman paraded around the Hotel premises early in the morning, goading Plaintiffs Benkirane, Laroussi, and Z. Ghaouta by saying to them, "They caught your uncle."  Gluckman first made the comments to Plaintiff Z. Ghaouta, and Plaintiff Z. Ghaouta responded, "What are you talking about?"  Gluckman said, "Saddam Hussein! We caught your uncle!"  Gluckman continued walking around the Oval Room and repeated the comments in front of other workers, including Plaintiffs Benkirane and Laroussi, saying "We caught your uncle!"  Gluckman and several other employees laughed in the midst of the incident, but Plaintiffs Z. Ghaouta, Benkirane, and Laroussi did not find Gluckman's conduct to be amusing at all.  Plaintiff Z. Ghaouta approached Gluckman and told him that he did not like the comment.  Gluckman responded, "Are you with us or are you with them?," thus reinforcing the impression that Gluckman had intended to portray the Moroccan employees as "enemies," as Saddam Hussein had been to the U.S.  When Plaintiff Z. Ghaouta returned on Wednesday, he went and spoke with HR Director Pratt about the incident.  Pratt said that he would speak to Gluckman.  A few days later Plaintiff Z. Ghaouta followed up with HR Director Pratt, at which point Pratt claimed that he "spoke to Gluckman but there was nothing [he] could do."  Unsatisfied with the result, Z. Ghaouta filed a grievance with the union.  On the day for which the "first step" of the grievance process was scheduled, Gluckman did not show up, allegedly because it was his day off, even though this was not an acceptable excuse for missing the grievance meeting.  When Plaintiff Z. Ghaouta expressed frustration regarding

Gluckman's absence, HR Director Pratt said, "Everyone is entitled to a day off. Why are you making this a big deal? [Gluckman] is one of our best managers. He didn't take a promotion from you. You didn't lose any money. So, why are you making a big deal?" Thus, HR Director Pratt blatantly tolerated Gluckman's hostile behavior and belittled Plaintiff Z. Ghaouta's concerns. The Hotel took no action against Gluckman.

44.    After the "Saddam Hussein" incident, in late 2003 and early 2004, Manager Gluckman began retaliating against Plaintiff Z. Ghaouta by giving him unfavorable work assignments, thereby exacerbating the already hostile work environment. In a given rotation, whoever had the smallest number of guests (commonly referred to as "covers") assigned to them would be assigned the next table. However, Gluckman would skip Plaintiff Z. Ghaouta on the rotation for large parties, thus changing the rules that had been in place for years, so as to allow someone else to take the larger parties, which resulted in better tips for that server and smaller tips for Plaintiff Z. Ghaouta. Because of Manager Gluckman's discriminatory behavior, Plaintiff Z. Ghaouta would serve up to 10-15 fewer guests than other, non-Moroccan servers in a given shift.

45.    In late 2003 or early 2004, Plaintiff Tourabi walked in on a conversation that employees Itri, Gramazio, and Janice Tracey (sometimes referred to as "Honey") were having in the cafeteria, and the three lashed out at him. Itri said, "You're not even American; why don't you go back to your country?" On another occasion in early 2004, a group of employees were reading newspaper articles about the Iraq war in the cafeteria. As Plaintiff Tourabi entered the area, Gramazio looked at him, smiled, and stated, "They should kill all the Muslims. They hate us." Gramazio and Itri then began to laugh. Banquets Director Shanahan was nearby and was aware of the interaction, but he did nothing to correct the behavior.

46.     Around that time in early 2004, Plaintiff C. Ghaouta had an asthma attack while at work and needed to go to the hospital immediately.  Plaintiff C. Ghaouta requested permission to leave work, but In-Room Manager Tasha (LNU) refused.  Without medical attention, Plaintiff C. Ghaouta's condition deteriorated and soon thereafter someone from the Hotel observed his infirmed state and called an ambulance for him.  While this was a more extreme circumstance, it reflected Manager Tasha's general habit of treating Plaintiff C. Ghaouta more harshly than non-Moroccan employees.

47.     Plaintiffs all encountered difficulty when requesting personal days, which only became more onerous with time.  For example, on July 4, 2004, Plaintiff Benkirane went to Director Shanahan to request a personal day.  Banquets Director Peter Shanahan said to Plaintiff Benkirane, "No, go see Laroussi."  Director Shanahan's response frustrated Plaintiff Benkirane because he knew that Shanahan was deliberately forcing him to negotiate vacation time with a fellow Moroccan employee, which served no useful purpose except to complicate and delay his request to take a personal day.  In the end, Director Shanahan did not grant Plaintiff Benkirane the personal day he had requested.

48.     On July 4, 2004, the cumulative stress from dealing with Director Shanahan's constant hostile and discriminatory behavior caused Plaintiff Benkirane to experience severe chest pains.  Plaintiff Benkirane went to the hospital and doctors confirmed that his chest pains were stress related.  He spent four days at the hospital.  Upon returning to work, much like Plaintiff Laroussi's treatment when he returned from a vacation in July 2002, Director Shanahan, with a menacing and sarcastic tone, asked, "Hamid, how can I make your life better?" clearly intending to cause Plaintiff Benkirane more distress.

49.     Towards the end of 2004 or the start of 2005, Food and Beverages Director Max Compagnon hired Samantha Rieu as an In-Room Manager. Within weeks after she was hired, Manager Rieu joined in on harassing Plaintiff C. Ghaouta. On one occasion towards the end of a shift, Plaintiff C. Ghaouta asked about an In-Room dining policy, to which Rieu replied, "You people are stupid." Plaintiff C. Ghaouta was with Youssef Ibenoudes, also Moroccan, at the time. They were both offended and Plaintiff C. Ghaouta filed a grievance based on that incident. The Hotel made light of the incident, claiming that Manager Rieu merely needed more experience, and refused to take any disciplinary actions against her.

50.     In retaliation against Plaintiff C. Ghaouta for reporting Rieu's "You people are stupid" comment, Rieu wrote up Plaintiff C. Ghaouta and others for reporting to work a few minutes *early*, which was highly unusual. Plaintiff C. Ghaouta went to GM Crellin to voice his complaint about the discipline. GM Crellin, Food and Beverages Director Compagnon, and Rieu held a meeting with Plaintiff C. Ghaouta, but the Hotel took no action against Rieu.

51.     Later in 2005, Plaintiff C. Ghaouta again suffered hostile treatment from In-Room Manager Rieu. Plaintiff C. Ghaouta had been discussing with several employees what it was like to be a Moroccan in France, explaining that, in his opinion, there was a significant amount of bigotry in France towards Moroccans. Manager Rieu, who is French, appeared bent on proving Plaintiff C. Ghaouta's point by interrupting him, and, referring to Moroccans, saying, "Those people don't want to work. They are thieves and go around the system."

52.     In 2005, years after the "Immigration Update" incident, Front House Manager Brent Glashan posted a note that was visible to other employees, which read: "Please let Ahmed know I need a copy of his passport." Given the attitude in the Hotel towards Moroccans, the manner of Glashan's request was very inappropriate. Plaintiff Amara nonetheless provided the

Hotel with a copy of his passport for the third time since he had began working at the Hotel – first when the Hotel hired him, again during the Immigration Update controversy, and again when Glashan requested it. In response, Plaintiff Amara filed a grievance.

53.      After Manager Gluckman left the Hotel in 2004, Daniel Gintwort replaced him as Restaurant Manager and the rotation issues that Plaintiff Z. Ghaouta had been experiencing ceased as Manager Gintwort treated Plaintiff Z. Ghaouta with fairness and respect.  However, in 2005, in an apparent effort to push Manager Gintwort to continue Gluckman's hostile behavior towards Plaintiff Z. Ghaouta, Assistant HR Director Maureen Hermann emailed Gintwort instructing him to write Plaintiff Z. Ghaouta up for inappropriately calling out on several specified dates.  However, Plaintiff Z. Ghaouta was present on the dates in question, so discipline was inappropriate, and Manager Gintwort therefore refused to write up Plaintiff Z. Ghaouta.  Manager Gintwort nonetheless directed Plaintiff Z. Ghaouta to accompany him to Assistant HR Director Hermann's office, where Hermann issued Plaintiff Z. Ghaouta a written warning despite the fact that he was present on the dates in question.  After the meeting with Hermann, Gintwort told Plaintiff Z. Ghaouta that he knew the discipline was not fair, and Gintwort then showed Plaintiff Z. Ghaouta the email from Assistant HR Director Hermann instructing him to discipline Plaintiff Z. Ghaouta.  Plaintiff Z. Ghaouta contacted Corporate HR VP Carolyn Clark, and one week later HR Director Pratt rescinded the warning.

54.      Brian Deshler replaced Gintwort as Restaurant Manager in the spring of 2005. Whereas Gintwort had treated Plaintiff Z. Ghaouta fairly, Manager Deshler behaved more like former Manager Gluckman.  In the beginning, Manager Deshler made generally hostile comments to Plaintiff Z. Ghaouta such as: "If it wasn't for the union, you'd be fired"; "They should double your union fees because that's the only thing keeping me from firing you"; and

"You wouldn't last in the real world."  However, shortly after he began his employment at the Hotel, Manager Deshler began denigrating Plaintiff Z. Ghaouta based on his national origin and religion; he would refer to Plaintiff Z. Ghaouta as "al-Qaeda," "Taliban," "the other Taliban," "Saddam Hussein," and "cobra."  In addition to making derogatory comments himself, Manager Deshler also encouraged others, such as employees Kerry Moore and John Sweeny, to harass Plaintiff Z. Ghaouta.  Moore, Sweeny, and others would say to Plaintiff Z. Ghaouta,  "The fucking Moroccans took over the union," "Taliban is coming," "Blah blah blah…speak English this is America; if you want to speak whatever go back to Afghanistan," and repeatedly called him "Saddam Hussein."  Manager Deshler witnessed this abuse many times, and he would just laugh in response.  In contrast, Deshler would also show favoritism towards non-Moroccan employees, such as Kenny Mendes and Kerry Moore.  For example, Plaintiff Z. Ghaouta very rarely came to work late, but if he came in even 10 or 15 minutes late, Deshler would give him a very hard time, often by looking for Z. Ghaouta in the locker room before his shift started, asking others whether he had arrived yet, and staring at his watch when he would first see Z. Ghaouta, as if to suggest that he was making sure Z. Ghaouta was not a moment late.  In contrast, when Mendes or Moore would arrive as much as an hour to an hour and a half late, Deshler would not discipline them at all.  Additionally, Manager Deshler made arbitrary rules to favor other employees.  For example, Deshler made a rule that the person assigned to the opening shift would be assigned the first three tables, which effectively took tables away from Plaintiff Z. Ghaouta in favor of Moore.  Manager Deshler also changed the procedures for requesting vacation time.  Typically, when an employee requested vacation time, the manager went to the most senior employee in the department, which would have been Plaintiff Z. Ghaouta, in order to confirm the requested days off.  Manager Deshler, however, changed the rule by giving less

senior employees preference so as to favor other employees over Plaintiff Z. Ghaouta. Plus, whenever Plaintiff Z. Ghaouta requested a holiday off, Manager Deshler would remark, "You guys make me nervous. Promise to call me if you receive the orders from al-Qaeda." Likewise, Manager Deshler would also arbitrarily change the procedures for "picking up tables" to benefit Server Moore over Plaintiff Z. Ghaouta, thus consistently denying Plaintiff Z. Ghaouta more favorable table assignments in favor of Moore and other non-Moroccan employees.

55.    In mid-2005, around the time when Brian Deshler joined the Hotel, Plaintiff C. Ghaouta started picking up shifts as a server in the Oak Room. When a permanent server position opened in the Oak Room, Plaintiff C. Ghaouta asked HR Director Pratt to transfer him over to the Oak Room. HR Director Pratt claimed that he could not transfer Plaintiff C. Ghaouta to the Oak Room because his brother, Plaintiff Z. Ghaouta, already worked there. Plaintiff C. Ghaouta reminded HR Director Pratt that a married couple was working in the Front Office together, two brothers were working in Laundry, and Plaintiff C. Ghaouta had been working with his brother, Plaintiff Z. Ghaouta, without incident for more than a year, filling shifts as a server in the Oak Room. The Hotel nonetheless decided not to fill the position at that time.

56.    Later in 2005, Plaintiff C. Ghaouta also requested a rotation number to work in the Oak Room as a Banquets roll call server, but the Hotel also denied this request. About six months prior to his request, the Hotel had awarded Beatrice, a cook, a spot on the rotation even though her position as a cook made her less eligible to qualify for a Banquets roll call server rotation number than Plaintiff C. Ghaouta. Kerry Moore also received a rotation number after requesting one.

57.    Shortly thereafter, still in 2005, after Plaintiff C. Ghaouta had previously requested a transfer to the Oak Room, the Hotel hired Roubini as an Oak Room Server.

Afterwards, following Plaintiff C. Ghaouta's complaints, the Hotel eventually allowed Plaintiff

C. Ghaouta to transfer to the Oak Room, and the Hotel credited Plaintiff C. Ghaouta with one

day of seniority more than Roubini.

58.     In 2005, after the U.S. Marines razed the town of Fallujah, Gramazio said to

Tourabi, "They can pray to Allah now," and then laughed sarcastically.  Plaintiff Tourabi

reported this incident to Banquets Director Shanahan and Assistant Manager Roy (LNU).  The

Hotel failed to take any disciplinary action against Gramazio.

59.     In the fall of 2005, Plaintiff Tourabi called in sick, and, while he was out, Anas

Laroussi observed Server Tracey and other workers accusing Plaintiff Tourabi of being in a

sleeper cell.  Anas Laroussi and Plaintiff Benkirane reported the comments to Plaintiff Tourabi.

The following day, Tracey said to Plaintiff Tourabi, "Please, if you're going to do anything let

me know so I can call in sick too," implying that Plaintiff Tourabi may have been planning

terrorist activities.  Plaintiff Tourabi went to Director Shanahan, who dismissed his complaints

by saying that "every ethnic group suffered something like this at one point," implying that

Plaintiff Tourabi should just ignore the conduct rather than complain about it.

60.     In September 2005, Plaintiff Amara was working as a Doorman on Dartmouth

Street at 12:30 pm.  After helping a customer, the customer tipped Plaintiff Amara, and Plaintiff

Amara put the cash tip into his pocket, as was customary.  The Hotel's Assistant GM Len

Czarnecki had apparently been watching Plaintiff Amara because he approached Plaintiff Amara

and said, "Let me see what is in your pocket," as if he suspected Plaintiff Amara had stolen

money from the customer.  Plaintiff Amara told him, "This is my tip."  Still seemingly bent on

harassing Plaintiff Amara about something, Assistant GM Czarnecki referred to the temporarily

parked vehicles being watched over by Plaintiff Amara and said, "I want you to send all of those

cars up to the garage." This was unusual as doormen customarily allowed guests to park cars on the street temporarily when they were quickly running in and out of the Hotel. Plaintiff Amara explained as much and emphasized that the guests whose cars were parked there at the moment included a woman with a broken leg who needed her car readily available, a doctor who may have needed to leave the Hotel immediately due to a potential emergency, and another guest who was a VIP customer and was therefore designated for special treatment. The Assistant GM appeared uninterested in his explanation, and Plaintiff Amara began sending vehicles up to the garage. In the process, Plaintiff Amara called fellow Doorman Klein, who was stationed on the St. James Street entrance, to tell him about the orders he had received to send the cars up to the garage. Klein was surprised, but he began sending his temporarily parked cars up as well, assuming that the order would apply to him too. However, when Assistant GM Czarnecki approached him a moment later, he asked Klein why he was sending the cars up to the garage. Klein responded, "Amara said you wanted us to send them to the garage." At that point, Czarnecki said, "I told *Ahmed* to do it, not you," and further instructed Klein to stop sending the cars up to the garage.

61.     On one occasion, in late fall 2005, an exterminator who frequently worked at the Hotel for an independent contractor told Plaintiff Benkirane about an exchange he had with Server Campbell. The exterminator had found a dead rat in the back alley of the Hotel, which he mentioned to Server Campbell in the ballroom afterwards. In discussing the matter with the exterminator, Campbell pointed to Plaintiffs Benkirane and Laroussi and referred to them as "rats" and said, "There are two Muslim rats, one with the name tag 'Hamid.'" After hearing of this incident from Plaintiff Laroussi, Plaintiff Z. Ghaouta approached Campbell with Plaintiff Laroussi and asked him about the comments. Referring to Plaintiff Benkirane, Campbell told

Plaintiff Z. Ghaouta, "I called him a rat because he is a rat." Plaintiffs Z. Ghaouta and Laroussi said to Campbell, "Don't say that," but Campbell responded, "No, he is a rat." When Plaintiffs Benkirane and Laroussi complained to HR Director Pratt, Pratt made no effort to deny that Campbell had referred to Plaintiffs Benkirane and Laroussi as rats, but he nonetheless summarily dismissed their complaints, telling them, "You guys are making way too much money to be complaining. Why are you complaining?" He then threatened them with retaliation, saying, "If you keep at this, I will hire more people," knowing that would have adversely affected the tips that the Plaintiffs would receive. Referring to Campbell's actions, HR Director Pratt said, "There's nothing in the [ethics] book to justify punishing him."

62. In mid- to late 2005, Plaintiff Z. Ghaouta sought outside intervention to remedy the hostile work environment at the Hotel. He contacted Caline Jarudi, Executive Director of the Arab Discrimination Committee ("ADC"), informing the ADC of the issues that he and other Moroccan workers confronted at the Hotel, including unfair disciplinary actions and harassment. After an investigation, Ms. Jarudi sent a letter to Fairmont Corporate HR VP Clark, expressing the ADC's concerns about Plaintiff Z. Ghaouta's letter. HR Director Pratt subsequently met with Plaintiff Z. Ghaouta and said to him, "We were not trying to get you in trouble. Why won't you forget the Saddam Hussein comment? We have no problems. The assistant made a mistake."

63. In 2005, Plaintiff Amara finally received a promotion to a full time doorman position, but only after the ADC complained to HR Director Pratt on his behalf.

64. On October 31, 2005, Plaintiff Laroussi filed a grievance based on the unfair workload that he was consistently assigned. Plaintiff Laroussi had made complaints about the unfair scheduling on several occasions.

65.    On December 16, 2005, Plaintiff Farouk applied for an in-house transfer to the dining room staff as a full time server in the Oak Room.  The Hotel refused to transfer him, claiming that such transfers were only permitted for employees who had been working as a server at the Hotel for at least six months without any record of discipline for the previous year, apparently overlooking the fact that Plaintiff Farouk clearly satisfied each of those requirements. After interviewing and considering Hotel employees Farouk and Moore, the Hotel instead hired Jeeve Aurora, an external candidate.

66.    In or around 2006, Server Tracey falsely accused In-Room Dining Server Majid Laroussi of hitting her in the ballroom's back alley.  Majid Laroussi was working a Banquets function, along with another 20 to 30 coworkers, and was trying to pass by a group of servers lining up to pick up their plates when Tracey screamed, "Don't touch me."  Majid Laroussi was merely trying to pass by her as he was carrying a tray full of dishes that he had just cleared from a table.  Food and Beverages Director Compagnon and Banquets Director Shanahan were also in the area.  Tracey reported the incident directly to HR Director Pratt by phone, falsely accusing Majid Laroussi of hitting her.  HR Director Pratt superficially investigated the matter.  HR Director Pratt refused to interview Plaintiff C. Ghaouta and Mr. Ibenoudes, even though they had both witnessed the incident, and he refused to release the security video that captured the incident.  The witnesses who he did interview contradicted Tracey's claim.  HR Director Pratt stopped investigating the incident when it became apparent that Tracey had fabricated the story. Whereas the Hotel would later fire Plaintiff Farouk for making supposedly false accusations against another employee, the Hotel took no action against Tracey whatsoever for making false accusations against a Moroccan employee.

67.     In March 2006, HR Director Pratt and other members of the Hotel's management falsely accused Plaintiff C. Ghaouta of theft.  An employee had apparently been overcharging customers for food delivered to their rooms as part of a scam to earn extra money.  However, as would have been clear through any cursory investigation into the matter, Plaintiff C. Ghaouta could not have been a part of the scam.  When guests ordered food, the cashier would post orders and enter them into the computer system.  The front desk staff then would notify the server of the order, and the server would retrieve the food and deliver it to the requested room.  Normally, the server would then submit to the cashier the same report that the front desk had given to the server.  The alleged theft had occurred on the overnight shift by someone from the In-Room dining staff; however, at the time of the specific incident in question, Plaintiff C. Ghaouta was predominantly working day shifts in the Oak Room and therefore could not have been the employee who mishandled the orders.  Similarly, Ibenoudes, also Moroccan, was not on duty either and therefore could not have been responsible for the thefts in question.  Interestingly, one of the witnesses that the Hotel interviewed in its investigation of Plaintiff C. Ghaouta was Server and Shop Steward Campbell, who had a known history of harassing Moroccan employees at the Hotel and would eventually lose his union steward position in part because of his discriminatory conduct.  Plaintiff C. Ghaouta explained to HR that even if he had been on duty, he would not have been able to accomplish such a scam because the cashier was the only person who could have engaged in overcharging the customers; the servers did not have access to the computer system necessary to engage in the scheme.  The Hotel began an investigation and ultimately suspended Messrs. C. Ghaouta and Ibenoudes for ten days, despite the fact that neither one of them had been on duty at the time of the incident in question.  Plaintiff C. Ghaouta was not paid for the days that he missed until two years after the incident, and even then, it was only after the

prolonged efforts of his Union. In addition, the Hotel never expunged the false accusations from his record. HR Director Pratt caused Plaintiff C. Ghaouta severe stress as he made the accusations known to virtually all of the Hotel staff, falsely suggesting that Plaintiff C. Ghaouta had engaged in theft, which he had not, and falsely claiming that thousands of dollars had been stolen, when in fact only hundreds of dollars were at issue. Director Pratt never corrected himself and neither he nor any other employee was disciplined for the false accusations.

68.    On February 8, 2006, Manager Caitlin Collins questioned Plaintiff Farouk about a particular women's bathroom that she alleged he had not cleaned properly. According to Manager Collins' account, when she went to inspect the bathroom, she discovered dark spots of dried material on the floor, trash in the receptacle, and only one bottle of soap. Without any demonstrable basis, Manager Collins claimed that no guests had entered the bathroom after Plaintiff Farouk had cleaned it at approximately 12:00 am during his overnight shift. By her own admission, Manager Collins inspected the bathroom and contacted Plaintiff Farouk by radio at approximately 6:00 am – six hours later – to clean the bathroom again. While that may be a slow time for bathroom use, six hours had passed, allowing ample time for guests and others to use the bathroom, which would not have been uncommon. Plaintiff Farouk politely told Manager Collins that he would try to re-visit the bathroom later in his rounds after he finished cleaning his remaining areas; however, his shift ended at 7:00 am, just one hour after Collins had called him, so he ran out of time to clean the bathroom a second time. The following day, the Hotel's Director of Housekeeping, Eddie Johnson, issued Plaintiff Farouk a Coaching and Counseling notice for engaging in insubordination and for failing to adhere to cleaning standards. Plaintiff Farouk had never received warnings about the quality of his work in the past and felt as though he did not deserve the Coaching and Counseling.

69.     In 2006, Paul Tormey replaced John Crellin as the Hotel's General Manager. GM Tormey, like his predecessor GM Crellin, has made clear to Plaintiffs and to Fairmont management that he would not take complaints about discrimination in the workplace seriously and that he would not make any effort to correct the hostile and discriminatory work environment at the Hotel. As a result, hostile discriminatory conduct has persisted at the Hotel despite the fact that Plaintiffs and others have filed numerous credible complaints and grievances with the Hotel on countless occasions.

70.     On March 8, 2006, Plaintiff Farouk requested a transfer to In-Room dining, but he was never called for an interview. Upon information and belief, a white, U.S.-born man was hired for that position.

71.     In April 2006, Plaintiff Farouk requested time off to Director Eddie Johnson, but Johnson denied his vacation request, telling Plaintiff Farouk to choose dates in July or August 2006 instead. As Director Johnson had suggested, Plaintiff Farouk requested vacation time in August, but Johnson again denied his request, telling him to request vacation time in the fall instead.

72.     On April 24, 2006, Plaintiff Farouk applied for another in-house transfer to the Hotel's Guest Services Department. The Hotel failed to offer Plaintiff Farouk an interview, but interviewed other members of its staff. The Hotel claimed that when HR received Plaintiff Farouk's first request to transfer, it determined he was not eligible to apply because HR mistakenly believed that Plaintiff Farouk had received a verbal warning, not a Coaching and Counseling session, for his alleged insubordination relating to the bathroom cleaning incident with Manager Collins on February 8, 2006. The Union filed a grievance, and the Hotel corrected

the problem, allowing Plaintiff Farouk to apply for the transfer to a bellman position.

Ultimately, the Hotel decided not to fill position at that time.

73.    Hotel management arbitrarily disciplined Plaintiff Laroussi on April 28, 2007,

when Managers Torres and Jennifer Naggy sent him home for the day, allegedly because he did

not set up a beverage station for 25 people in the State Suites.  On that day, Managers Torres and

Naggy assigned Plaintiffs Laroussi and Benkirane to set up the Venetian room and serve full

breakfast to the 200 people who would be attending a function.  On that same day, Managers

Torres and Naggy assigned two non-Moroccan employees, Servers Valdez and Campbell, to set

up and serve beverages only at another function, where only 135 people would be attending.

Despite receiving the more onerous assignment, Plaintiffs Laroussi and Benkirane did not

complain and proceeded to serve the guests in the Venetian room.  On top of the 200-person

function and the 135-person function, there was a third function at the Hotel that day in the State

Suites, which featured only 25 people.  Plaintiffs Laroussi and Benkirane had mistakenly

assumed that since they had been assigned the far larger function that required serving full

breakfasts (as opposed to beverages only), the two non-Moroccan employees would tend to the

25-person function.  Had that been the case, the non-Moroccan employees would have still been

responsible for far fewer guests (160) than Plaintiffs Laroussi and Benkirane (200).  However,

when Plaintiffs Laroussi and Benkirane started to put out coffee and food for the group of 200

guests in the Venetian room, Managers Torres and Naggy approached Plaintiff Laroussi and

aggressively asked him why he had not yet set up the downstairs beverage station in the State

Suites.  Plaintiff Laroussi explained that he thought that the other two employees would be

setting up the station.  More importantly, he noted that he had never been directed to set up the

station.  Regardless, he told Managers Torres and Naggy that he and Plaintiff Benkirane would

finish their work in the Venetian room and then set up the beverage station downstairs in the State Suites. At that time, the other two non-Moroccan employees were sitting down and relaxing as they had a lighter workload and were able to manage a break, yet Managers Torres and Naggy never confronted them about failing to set up the service station. After finishing with the Venetian room, Plaintiff Laroussi went downstairs and set up the 25-person beverage station in the State Suites. At that point, he received a call to go to the Banquets Office. There, he found Harrington of security, HR Director Pratt, and Manager Torres. Torres instructed Plaintiff Laroussi to go home. Later that afternoon, Manager Torres called Plaintiff Laroussi and told him that he should not return to work until they called him in. The Hotel's management falsely accused Plaintiff Laroussi of insubordination, claiming that he had refused to take orders from his managers, and also absurdly accused Plaintiff Laroussi of threatening his fellow employees. Later that week, in recognition of the fact that Plaintiff Laroussi should not have been disciplined, Plaintiff Laroussi was paid in full for the three days he had been suspended. Nonetheless, it became apparent that the Hotel was looking for a basis upon which to discipline Plaintiff Laroussi. The Hotel never disciplined Managers Torres and Naggy or HR Director Pratt for their treatment of Plaintiff Laroussi, which included making false accusations alleging he had threatened fellow employees.

74.    On June 17, 2006, Plaintiff Farouk received a verbal warning based on the Hotel's false allegation that he had called in sick three times within a 90 day period, which would have been a violation of Hotel policy. Plaintiff Farouk's union shop steward, Plaintiff Z. Ghaouta, spoke with HR about the matter. HR investigated and found that it had again made a mistake, as Plaintiff Farouk had not called in sick three times within a 90 day period, and therefore no violation had occurred.

75.     One Saturday in June 2006, employee Kerry Moore was working on "Roll Call" in Banquets. In front of approximately twenty other employees, including Banquets Director Shanahan and Food and Beverages Director Compagnon, Moore referred to Plaintiff Tourabi's behavior as "hyper" and said, "No wonder your kids are like that," and "I hope your kids don't grow up like you," knowing that Plaintiff Tourabi's children suffer from autism. Plaintiff Tourabi asked Moore not to speak of his children in such a manner. Moore then threatened him, "If you're a man, go outside. Next time you say something to me, I'm going to kick your ass." Moore said to Manager Jacinthe Linteau, "If you don't keep him away from me, I'm going to break his mouth." Plaintiff Tourabi reported this incident to the union, naming several witnesses to corroborate his story.

76.     A few days after Plaintiff Tourabi reported the incident where Moore had physically threatened him and mocked his children, Moore falsely reported to HR Director Pratt that Plaintiff Tourabi had pushed him. Like his response to the false accusation by Server Campbell in 2003 (see supra at ¶ 36), HR Director Pratt conducted a sham investigation, failing to investigate the witnesses that Plaintiff Tourabi had provided, including Plaintiff Z. Ghaouta, and instead interviewing employees who were not even present at the time of the incident. Moore named Jackie as a witness, but Jackie (LNU) did not support his claim. HR Director Pratt called Romel, a Banquets waiter who was not present when the alleged altercation occurred and who had not even been assigned to the same function, in the hope that Romel would be a witness for Moore, but Romel also said he could not confirm Moore's allegations. During his first conversation with Plaintiff Z. Ghaouta about the incident, HR Director Pratt told Plaintiff Z. Ghaouta that Plaintiff Tourabi would be suspended for a week for his behavior, despite having no information supporting Moore's allegations against Plaintiff Tourabi and despite his

knowledge that Moore had recently threatened Plaintiff Tourabi in front of Manager Linteau. He never threatened Moore with such discipline even though Plaintiff Tourabi had several witnesses ready to support his allegations against Moore. In the end, Moore's accusations against Plaintiff Tourabi proved false, and he *admitted* to threatening Plaintiff Tourabi, but HR Director Pratt made light of Moore's behavior, issuing him a one-day suspension, which Moore never served.

77.    On June 5, 2006, Plaintiffs signed a petition regarding the unfair treatment that they had suffered at the Hotel and submitted it to then-GM Crellin and HR Director Pratt. The petition noted "the abuse, harassment, differential and unfair treatment" that employees of "Muslim and Arab descent" were suffering at the Hotel.

78.    Shortly after Plaintiffs submitted the June 5, 2006, Petition to the Hotel, Banquets Director Shanahan made the work environment substantially more hostile. For example, Shanahan began overloading Plaintiff Tourabi with work that did not fall within his job description, such as cleaning the dishes and removing coffee urns.

79.    On July 5, 2006, Plaintiff Farouk filed an MCAD Complaint alleging race and religious discrimination.

80.    In July 2006, HR Director Pratt approached Plaintiff Z. Ghaouta and asked him to convince Plaintiff Farouk to withdraw his MCAD complaint. Plaintiff Z. Ghaouta refused, telling HR Director Pratt, "If you had done the right thing in the first place you wouldn't be in this position." Pratt responded to Plaintiff Z. Ghaouta, saying, "You guys don't want to learn. There is no affirmative action for you guys. Keep challenging me. Don't forget who you work for." Plaintiff Z. Ghaouta informed Plaintiff Farouk about HR Director Pratt's behavior, which made Plaintiff Farouk feel his employment at the Hotel was threatened. Plaintiff Z. Ghaouta filed a grievance with the union but no investigation ensued.

81.    In September 2006, Restaurant Manager Deshler asked Plaintiff Z. Ghaouta, "Why are you people so angry?" Answering his own question, he said, "I think it's in your nature."

82.    In September 2006, Banquets waiter Kelvin Horesely, who, as discussed supra, had been hired from the Meridian to fill an opening over Plaintiff Laroussi, made offensive remarks directed toward Plaintiff Tourabi, saying, "If you're going to do anything let me know," implying that Horesely believed that Plaintiff Tourabi might commit a terrorist attack at the Hotel. Plaintiff Tourabi told Banquets Director Shanahan about this incident, but no action was taken.

83.    On another occasion later in 2006, Banquets Director Shanahan, Horesely, and Plaintiff Tourabi were speaking about Plaintiff Tourabi's upcoming trip to visit his father in Morocco when Horesely told Plaintiff Tourabi in a sarcastic and derogatory tone that he should "be careful at the airport" because Arabs were being "watched by the FBI." Elmer Edmonson, Hung Lee, and Anas Laroussi witnessed this exchange. Director Shanahan laughed at Horesely's comment and did nothing to correct his behavior.

84.    In September 2006, Housekeeping Director Johnson changed Plaintiff Farouk's schedule to the overnight shift even though Plaintiff Farouk had always been scheduled for day shifts. Plaintiff Farouk preferred the day shift, and he had seniority over others who were assigned day shifts. When Plaintiff Farouk approached Director Johnson about his schedule, Director Johnson said to Plaintiff Farouk, "I don't talk to people like you," by which Plaintiff Farouk suspected she meant Muslim people. Plaintiff Farouk called the ethics line and spoke with HR Director Pratt about the comment. Pratt then met with Director Johnson, Assistant GM Czarnecki, and Plaintiff Farouk. Plaintiff Farouk requested a written apology and his shifts back.

He never received the apology, but eventually he got his shifts back. The Hotel took no known disciplinary action against Manager Johnson.

85. On September 15, 2006, Plaintiff Farouk interviewed for a full-time bellman position with the Director of Guest Services, Brent Glashan, and Assistant GM Czarnecki. On September 18, 2006, Plaintiff Farouk interviewed with GM Crellin and HR Alex Pratt as well. On September 25, 2006, the Hotel offered Plaintiff Farouk a transfer to a full-time bellperson position, which Plaintiff Farouk accepted. He began his new position on October 8, 2006, and, to compensate for the Hotel's previous failure to transfer him to the bellman position, the Hotel gave him one day more seniority than Mike McPherson, who had been hired before Plaintiff Farouk.

86. On September 28, 2006, in the midst of an event in the large ballroom, recently appointed Banquets Manager Lonnie Giacommo tapped Plaintiff Laroussi on the shoulder and falsely accused him of eating food off of a guest's plate, which was a very serious charge to make against a server. Plaintiff Z. Ghaouta witnessed the exchange and confirmed that the accusation was false. A few months later, in the Banquets room, Giacommo again yelled wildly at Plaintiff Laroussi when he slipped and nearly fell to the ground. GM Paul Tormey later apologized to Plaintiff Laroussi for Giacommo's behavior, but no known disciplinary action was taken against Banquets Manager Giacommo.

87. In early October 2006, Plaintiff Laroussi spoke to Director Shanahan about the repeated harassment by Managers Giacommo and Linteau and asked Shanahan to intervene on his behalf. Plaintiff Laroussi offered to drop his outstanding grievances and complaints against the Hotel if the harassment ceased. Director Shanahan refused. Director Shanahan subsequently emailed HR Director Alex Pratt and Food and Beverages Director Compagnon to tell them about

this conversation with Laroussi. HR Director Pratt responded by explaining that Plaintiff Laroussi was planning to file a complaint at the MCAD, apparently motivating him to do nothing to correct the behavior that Plaintiff Laroussi had complained of.

88.    On October 3, 2006, Manager Linteau threatened Plaintiff Laroussi, telling him that if he did not drop his grievance against Manager Giacommo, Plaintiff Laroussi would be in "a lot of trouble." At the grievance meeting the following day, Director Shanahan and Food and Beverages Director Compagnon defended Manager Linteau. Director Compagnon said, "It's very hard to work with Aziz because he complains too much."

89.    In early November 2006, when Plaintiffs Benkirane and Laroussi requested vacation time to observe Ramadan, Director Shanahan said to them, "This is not Morocco," implying that Plaintiffs therefore had no right to take time off for their religious holidays. Plaintiffs filed a grievance on the date of the incident.

90.    On another occasion, Plaintiff Benkirane approached Banquets Director Shanahan about payment due to him and, with Plaintiff Laroussi present, Shanahan repeated to Plaintiff Benkirane three times, "I hate Moroccans!" The Hotel conducted an investigation and acknowledged that Director Shanahan had made the statement, "I hate Moroccans." Director Shanahan admitted that he had made the statement, but he characterized his statement as having been made in jest. The Hotel appeared to accept Director Shanahan's claim that he had made the comment in jest, as it took no significant disciplinary action against him.

91.    In November 2006, after hearing about calls that had been made to Fairmont Corporate's Ethics Hotline in mid-November and the June 6 letter to HR Director Pratt regarding unfair treatment of Moroccan employees, the new GM, Tormey, requested a meeting with Plaintiff Z. Ghaouta and Server Campbell. GM Tormey first met with Campbell and then met

with Plaintiff Z. Ghaouta.  When Plaintiff Z. Ghaouta entered the room, GM Tormey told him, "I don't care if you're black, red, green, or yellow . . . .  What happened in the past, happened in the past.  When you walk through that door we are all here to work; nothing else but work." Plaintiff Z. Ghaouta told GM Tormey that he should at least listen to both sides since he had only heard Campbell's side.  GM Tormey objected, saying, "I don't want to hear anything." Following this meeting, Plaintiff Z. Ghaouta contacted Fairmont Corporate's Ethics Hotline again, explaining that he had tried to open a constructive line of communication with GM Tormey to correct the hostile and discriminatory environment at the Hotel, but that Tormey and Hotel management failed to take his claims seriously.

92.    On November 6, 2006, Plaintiff Farouk's shift began at 8:00 am and ended at 4:30 pm; however, department employees typically worked through their lunch hour and left at 4 pm. On that day, Plaintiff Farouk worked through his lunch hour and clocked out at 4:25 pm, after several other employees had already clocked out.  Shortly after 4:00 pm Assistant Manager De Vries, told Plaintiff Farouk that HR wanted to meet with him.  HR Director Pratt, Mr. Harrington of security, De Vries, and a Benefits Manager were present.  Plaintiff Farouk asked for a union representative to join him, but Tracey was the only available steward.  Plaintiff Farouk did not want her to represent him because of her history of making discriminatory comments, so he asked that the meeting be rescheduled or to have a third party join the meeting.  HR Director Pratt refused to reschedule the meeting.  Plaintiff Farouk started to leave, but the Harrington, stood in front of the door, preventing Plaintiff Farouk from leaving.  HR Director Pratt told him that the only steward available was Tracey and that if he refused to meet at that moment he would not reschedule the meeting.  Plaintiff Farouk left HR Director Pratt's office and went to the locker room to change his clothes.  The Director of Security followed him and told him that

he was suspended for one week and had five minutes to leave the building.  When Plaintiff

Farouk left, he punched out at 4:25 pm.

93.     On November 9, 2006, Chef Laurent Poulin, in an email to Pratt, falsely accused

Plaintiff Laroussi of pushing another employee, Ronnie Edmelson.  HR went out of its way to

seek cooperation from Edmelson.  Plaintiff Laroussi requested the videotape from the camera

situated where the alleged altercation took place because he knew that the video would exonerate

him.  Despite the employee's false claims and Plaintiff Laroussi's grievance, the Hotel took no

disciplinary action against him.  Afterwards, Edmelson told Plaintiff Laroussi to be careful as the

Hotel management was out to get him.

94.     On November 13, 2006, Plaintiff Farouk met with HR at 11:30 am.  HR Director

Pratt told Plaintiff Farouk that the Hotel was terminating his employment for making false

accusations against McPherson, clocking out five minutes early on November 6, 2006, and

failing to remain at the HR meeting as requested on November 6, 2006.  HR Director Pratt issued

Plaintiff Farouk three written warnings simultaneously to satisfy the Hotel's policy of only

terminating employees after counseling the employee for three incidents of misconduct.  The

false accusation charge was based on the Hotel not having corroborated an accusation that

Plaintiff Farouk made about a fellow employee (that was in fact based on Plaintiff Farouk's

misunderstanding about what had been reported to him about the employee's behavior).

However, several other non-Moroccan employees had made vicious false allegations towards

Moroccan employees, (see ¶¶ 15, 28, 36, 67, 73, 76, 93, 124-125), yet the Hotel had not

terminated their employment or even disciplined them.  In addition, other employees in Plaintiff

Farouk's department, as a matter of course and on the day in question, also clocked out as many

as 30 minutes before the official end of their shift without checking with a supervisor and

without any discipline.  Moreover, Plaintiff Farouk only left the November 6 meeting because he refused to be represented by Steward Tracey, who had a known bias against Moroccans.

95.    On November 17, 2006, Plaintiff Benkirane filed a complaint of discrimination against the Hotel based on religious creed (Islamic) and National Origin (Moroccan).

96.    In mid-November 2006, Plaintiff Z. Ghaouta had an approximately one and a half hour long conference call with Fairmont Corporate's Manager Amanda Holmes and the Fairmont Corporate HR Director Bonnie Holbrook, wherein Plaintiff Z. Ghaouta broadly stated all of his grievances during the call.

97.    In late November 2006, GM Tormey called Plaintiff Laroussi into his office. During that meeting, GM Tormey told Plaintiff Laroussi told that he should stop filing grievances and drop his MCAD complaints.  GM Tormey said, "I don't care about what happened in the past.  That was another GM."  He also said, "You work, or you will be out the door."  He warned Plaintiff Laroussi, "Don't go to complain to the union."  GM Tormey said that if the union came, then he would "take a day off," implying that he would avoid any union grievance procedures.

98.    On December 15, 2006, Plaintiff Farouk filed a complaint of retaliation against the Hotel.

99.    On December 25, 2006, the Hotel hosted a brunch for the holiday.  At the brunch, Plaintiff Z. Ghaouta asked Busser Mohammed Shihabudine, who is from Bangladesh, to perform a task.  Moore interjected and said to Plaintiff Z. Ghaouta, "Don't talk to him; you don't even tip him."  Plaintiff Z. Ghaouta said to Moore, "I'm not talking to you."  In front of Managers Deshler and Food and Beverages Director Compagnon, Moore said to Mohammed, "Don't talk to him; he's one of them," meaning that Plaintiff Z. Ghaouta is Moroccan, and then Moore said

to Plaintiff Z. Ghaouta, "I'm going to put a cap in your ass." Plaintiff Z. Ghaouta filed a

grievance with Andrea Mitsch in HR. Nothing ever came of the grievance, not even a

preliminary investigation, which was standard grievance procedure, until Plaintiff Z. Ghaouta

faxed an affidavit to HR six weeks later. HR Director Pratt called Plaintiff Z. Ghaouta, Moore,

and Director Compagnon and claimed that no one could corroborate Mr. Z. Ghaouta's story, and

he then dismissed the matter.

100.    In early 2007, ADC Executive Director Jarudi met with GM Tormey, HR Director

Pratt and others. In that meeting, GM Tormey told Ms. Jarudi, "I have two problems: the rats

and the Moroccans. I took care of one and I can't figure out the other."

101.    Shortly after that meeting between GM Tormey and Executive Director Jarudi,

GM Tormey called a Banquets meeting to address the group, but he looked at Anas Laroussi and

Plaintiff Tourabi in particular and said that he did not want to hear any complaints about "past"

incidents, and he said that if somebody is "not happy," he can "run and complain" to his "little

organization," clearly referring to Plaintiffs' communications with the ADC. He then said,

"Don't let the door hit you in the back," making it clear that he did not want employees to file

complaints and that employees who did complain would risk termination of their employment.

102.    In early 2007, Server Tracey, a union steward at the time, told Banquets Server

Lee Hung "to stay away from Moroccans or you will have no friends in here and you will be

miserable."

103.    In 2007, Banquets Director Shanahan was discussing a vacancy in Banquets with

Food and Beverages Director Compagnon and the possibility of Plaintiff Z. Ghaouta applying to

fill the position. Director Shanahan said, "I don't want another Aziz in my department; I have

enough Moroccans." Plaintiff Laroussi and Plaintiff Z. Ghaouta overheard this comment while in the Banquets office making copies of a grievance.

104.    On January 8, 2007, Plaintiffs and several other employees signed another petition and submitted it to HR Director Pratt that complained about discrimination and harassment in the workplace.

105.    On January 8, 2007, the Hotel issued Plaintiff Laroussi an Employee Problem Solution Notice, arbitrarily disciplining him based on false allegations about threats he had supposedly made to fellow employees and his general behavior in the workplace. Specifically, Plaintiff Laroussi had asked Server Campbell to stay and to assist him with his workload during the evening shift. When Campbell subsequently fell ill, HR Director Pratt blamed Plaintiff Laroussi for Campbell's illness, telling Plaintiff Laroussi that he would be suspended for "making Bob sick."

106.    In January 2007, Plaintiff Z. Ghaouta was working when Manager Deshler said to him, "Look at this." Plaintiff Z. Ghaouta had dishes in his hand so he asked Deshler to wait while he put them down, but Deshler hurried him. Deshler then handed a "Micros" check to Plaintiff Z. Ghaouta, which included an order for a "blackened" cheeseburger and a feta salad and a note that read "GO FUCK URSELF." Plaintiff Z. Ghaouta was annoyed by the behavior as he realized that Deshler was once again trying to harass him – likely entering the listed items to reflect the color of Plaintiff Z. Ghaouta's skin (*blackened* cheeseburger) as well as his Moroccan heritage (feta salad). Plaintiff Z. Ghaouta threw the check into the trash. After thinking about the incident, Plaintiff Z. Ghaouta retrieved the check from the trash as evidence of Deshler's continuing harassment. Plaintiff Z. Ghaouta sent the Micros check to HR Director Pratt. Pratt responded to Plaintiff Z. Ghaouta in writing by telling him that he had investigated

the matter; he falsely claimed that Manager Deshler did not intend the Micros check for Plaintiff

Z. Ghaouta and that the check was meant merely as a "joke." However, Manager Deshler had

clearly printed the check and presented it to Plaintiff Z. Ghaouta--not to any other person--and

therefore the check must have been intended for Plaintiff Z. Ghaouta. Further, whether intended

as a joke or not, Plaintiff Z. Ghaouta found Deshler's behavior offensive, and, given Manager

Deshler's history of harassing Plaintiff Z. Ghaouta, Deshler's claim that he intended the check as

a joke should have been highly dubious to HR Director Pratt.

107.    Plaintiffs Z. Ghaouta and C. Ghaouta filed a joint grievance on January 15, 2007,

complaining of Manager Deshler's harassment and discriminatory behavior. Among other

comments, referring to Plaintiffs Z. and C. Ghaouta, Manager Deshler had said, "They are going

to bomb the hotel," and he had called C. Ghaouta "Chakib Taliban" on numerous occasions.

108.    Shortly afterwards, while Plaintiff Z. Ghaouta was in Morocco, HR Director Pratt

and Manager Deshler called Plaintiff C. Ghaouta into the office, knowing that he would be

without the support of his brother, and tried to convince him to sign a statement that Deshler was

only joking when he made the "Chakib Taliban" comments, but Plaintiff C. Ghaouta refused to

sign the statement.

109.    On January 16, 2007, Plaintiff Z. Ghaouta filed an MCAD Charge of

Discrimination on the basis of national origin.

110.    On January 17, 2007, Plaintiff Tourabi filed an MCAD Charge of Discrimination

on the basis of national origin.

111.    On February 14, 2007, Plaintiff Laroussi filed a grievance based on Server

Valdez's hostile conduct. In the midst of discussing schedules, Valdez aggressively swung a

door at Plaintiff Laroussi while Laroussi was standing in the doorway. The door would have hit

Plaintiff Laroussi and caused him injury had he not quickly jumped out of the way. Plaintiff Benkirane and Director Shanahan witnessed the incident. Neither Shanahan nor any other member of Hotel management took any action against Valdez.

112.    On March 9, 2007, Food and Beverages Director Compagnon ordered Plaintiff Laroussi's brother, Anas, and Plaintiff Tourabi to participate in a wine tasting exercise despite the fact that consuming alcoholic beverages violated their religious beliefs. According to Director Compagnon, customers had been complaining that the wait staff was not particularly familiar with the wine selection. Anas Laroussi and Tourabi requested religious accommodations from Manager Giacommo, who rejected their requests and told them that their attendance at the tasting was mandatory and that no employees could request the time off. Anas Laroussi and Plaintiff Tourabi then went to Banquets Director Shanahan who also rejected their request for a religious accommodation and threatened them by telling them that the tasting was mandatory and that if they did not attend the meeting, they would lose their night hours. In order to avoid the loss of hours, both Plaintiff Tourabi and Anas Laroussi attended the meeting. At the wine tasting event, Anas Laroussi and Plaintiff Tourabi flipped their glasses upside down so that no one would pour the wine into their glasses. Director Compagnon flipped their glasses upright, poured wine into their glasses, and told them to sniff the wine. Plaintiff Tourabi and Anas Laroussi refused. Director Compagnon said, "I know you don't drink, but sniffing it is okay." However, a moment earlier, Director Compagnon had just finished explaining to the group that sniffing the wine causes the wine to enter into the body's "system," so Anas Laroussi and Plaintiff Tourabi refused to sniff the wine, as they did not want the wine in their systems. Director Compagnon's insistence that they attend the event and that they sniff the wine caused Anas Laroussi and Plaintiff Tourabi humiliation and distress as their fellow employees began

mocking them and making remarks about whether or not they could be servers since they had to pour the wine as a part of their jobs. After reviewing the schedule, Plaintiff Tourabi noticed that Janice Tracey, Ralph Gramazio, Kelvin Horesely, Elmer Edmonson, and Carlos (LNU) did not attend the meeting. According to Plaintiff Tourabi's conversation with Edmonson, Edmonson had previously had a drinking problem and decided not to go despite the fact that the meeting was mandatory. Edmonson was still able to work the dinner that night, despite not attending the meeting and despite Director Shanahan's representation that failure to attend the meeting would result in a loss of hours.

113.    On March 16, 2007, Plaintiff Tourabi responsibly voiced concerns to Manager Giacommo about how to handle service for a particular event, which was not uncommon, and suggested his team setup the event differently. Rather than considering Plaintiff Tourabi's constructive feedback, as would have been customary, Manager Giacommo responded by screaming at Plaintiff Tourabi with raging anger, yelling at him with his face just inches away from Plaintiff Tourabi's face, "I am the manager. I am the one who decides. Just do what you're told." Manager Giacommo did not react to such constructive feedback from other employees in this manner. Hung Lee, Roger Mortell, and Anas Laroussi witnessed this incident. In investigating the incident, Human Resources only called Roger Mortell, presumably suspecting he would be a friendly witness, but even Roger Mortell corroborated Plaintiff Tourabi's story. Still, the Hotel took no action.

114.    On March 22, 2007, Plaintiffs Z. Ghaouta and C. Ghaouta filed a grievance based on Manager Craig Cooper's harassing and discriminatory behavior. During a very busy day, Manager Cooper falsely reported to Plaintiff C. Ghaouta that guests at one of his tables (table 11) had complained about Plaintiff C. Ghaouta's service. Wanting to make sure he served his guests

effectively, he went to their table and asked whether he could assist them and, in a very polite manner, whether they had complained about his service to a manager or other member of the staff. The individuals at the table told him very clearly that they had in no way complained about or were in any way dissatisfied with his service. Plaintiff Z. Ghaouta had experienced similarly harassing behavior from Manager Cooper. For example, Cooper would, without any basis, often accuse Plaintiff Z. Ghaouta of not effectively attending to his tables, or he would arbitrarily tell Plaintiff Z. Ghaouta to "shut up." Messrs. C. Ghaouta and Z. Ghaouta filed a grievance over these issues, but the Hotel did not investigate. Although Messrs. C. Ghaouta and Z. Ghaouta had legitimately complained about Manager Cooper's behavior to no avail, the Hotel terminated Manager Cooper's employment some time later for the unrelated reason that he had been speaking to guests while intoxicated.

115.    Plaintiff Laroussi filed a grievance on March 23, 2007, when he was forced to lift a heavy refrigerator by himself. When Plaintiff Laroussi expressed concern about having to perform this duty, Director Shanahan and Manager Linteau belittled him and told him that he was not doing his job adequately. Plaintiff Laroussi was told to call for help when it came time to lift the refrigerator. When he did so, however, no one came to help him. In May 2009, Plaintiff Laroussi had spine surgery.

116.    On March 24, 2007, at a dinner function, Manager Linteau asked Plaintiff Tourabi to "bus the room." Nine people were working that day, and Plaintiff Tourabi was the only Moroccan and the only one that Linteau had asked to bus the tables. Plaintiff Tourabi told Manager Linteau that he was busy tending to his tables at that moment and that there were other servers on duty who were not busy at all. Indeed, there were four or five other employees who were sitting behind Linteau doing nothing. Rather than fairly assigning the extra work to one of

the idle employees, Linteau yelled at Plaintiff Tourabi, "I don't care how many people are on the job. I want you to go and do it!" Plaintiff Tourabi said, "When I am done with the guests I'll do it." About fifteen minutes later, after helping his guests, Plaintiff Tourabi went to the reception area and the glasses still were not bussed. In the ballroom foyer, Plaintiff Tourabi saw Director Shanahan with his radio. Shanahan said into the radio, "Okay, he's here." Plaintiff Tourabi filed a grievance with Plaintiff Z. Ghaouta, but the Hotel took no action against Linteau.

117.    On March 29, 2007, Plaintiff Tourabi filed an MCAD complaint for retaliation.

118.    On April 19, 2007, Servers Valdez and Campbell harassed Plaintiff Benkirane by telling him, right before a meeting about Plaintiff Laroussi's workload, that Plaintiff Benkirane must either side with them or they will make his life miserable like that of Plaintiff Laroussi. Plaintiff Benkirane promptly reported this to Director Shanahan, but nothing was done.

119.    On April 27, 2007, Plaintiff C. Ghaouta filed an MCAD Charge of Discrimination on the basis of national origin.

120.    On June 17, 2007, a visitor began harassing Plaintiff Laroussi, yelling at him, "Go back to your country." He then hit Plaintiff Laroussi in the face and broke his eyeglasses and then proceeded to chase Plaintiff Laroussi through the hotel. Plaintiff Laroussi, fearing for his safety, found refuge behind a locked door, which the visitor attempted to break through. Plaintiff Laroussi used the radio to call for help. Manager Giacommo came running and quickly escorted the person out of the Hotel without attempting to determine the person's identity. Physically injured and terribly upset by the incident, Plaintiff Laroussi went to the hospital for treatment of his injuries and later saw a psychiatrist to process the incident. As a result of the ensuing stress and upon his doctor's recommendation, Plaintiff Laroussi took some time off to recuperate. Rather than express understanding about the traumatic incident, the Hotel allowed the situation

to worsen. Server Robert Campbell complained that he could not work with Plaintiff Laroussi since, as he falsely suggested in front of Manager Torres, he thought that Plaintiff Laroussi was "crazy." Immediately afterward, Campbell falsely alleged, "Aziz set that guy [the visitor] up to attack him; he is Aziz's friend." Manager Torres took no disciplinary action against Server Campbell for making such false accusations. Plaintiffs Z. Ghaouta, Laroussi, and Benkirane went to GM Tormey a few days later to ask him to calm Campbell down, but Tormey refused to take any action.

121.    When Plaintiff Laroussi returned to work in August 2007, he continued his strong work performance and even had the opportunity to serve President Clinton, who was pleased with the service he received. However, Plaintiff Laroussi continued to experience pressure from being assigned too much work. In a meeting with GM Tormey, Plaintiff Laroussi told Tormey that he would drop the grievances if the harassment stopped. Tormey laughed to himself and refused to take any action to stop the harassment of Plaintiff Laroussi.

122.    On September 18, 2007, Food and Beverages Director Max Compagnon emailed Banquets Director Shanahan to discuss a serious complaint against Manager Linteau. The complaint discussed Linteau's angry and inappropriate behavior in front of employees and clients – all of whom happened to be non-Moroccan. In the email, Food and Beverages Director Compagnon asked Banquets Director Shanahan to speak with Linteau about her behavior in front of Hotel clients. Director Compagnon acknowledged past issues with Manager Linteau's behavior towards employees, but stated a new urgency because her recent actions could affect business and not simply her working relationship with colleagues.

123.    On November 5, 2007, Plaintiff Laroussi was working when he received a radio call from Banquets Director Shanahan who asked Plaintiff Laroussi to come to his office.

Plaintiff Laroussi entered the office and saw Director Shanahan, along with HR Manager Andrea Mitsch and Jennifer Parent, an assistant to HR Director Pratt. Director Shanahan was rubbing his hands in an aggressive manner, as if to suggest that he was preparing to take pleasure in disciplining Plaintiff Laroussi. Shanahan told Plaintiff Laroussi that HR Director Pratt wanted to speak to him. Union Steward Anas Laroussi accompanied Plaintiff Laroussi to HR Director Pratt's office. Pratt told Plaintiff Laroussi that he received a complaint that Plaintiff Laroussi had been "hugging" Manager Torres at the Hotel earlier that morning. While Plaintiff Laroussi denies that he hugged Manager Torres at work that morning, or on any morning, he failed to see the relevance of the allegation. Plaintiff Laroussi said, "I hug only my wife and my kids." Plaintiff Laroussi then returned to work. Plaintiff Laroussi worked the following two days without incident.

124.    On Thursday, November 8, 2007, Plaintiff Laroussi arrived at work, and, after changing into his work clothes, he was approached by two police officers. The officers questioned Plaintiff Laroussi about an email that Manager Torres had falsely alleged that Plaintiff Laroussi had authored, and which Torres claimed he had received on Monday, November 5, 2007. Manager Torres apparently claimed that Plaintiff Laroussi suggested he was going to "blow up" the Hotel and that "it was a good day to die." Plaintiff Laroussi denied having ever authored such an email or expressed such a sentiment and questioned why the Hotel would have delayed calling the police if it had suspected in good faith that he had indeed written such an email or made such a threat. The police checked Plaintiff Laroussi's identification and then left the premises without taking the absurd allegations seriously. However, the false accusation devastated Plaintiff Laroussi as the matter became a public spectacle. Virtually every employee at the Hotel knew that the police came to investigate Plaintiff Laroussi to determine

whether or not he had been involved in a terrorist plot to set off explosives at the Hotel.

Employees were gathered and waiting before Plaintiff Laroussi even knew what was transpiring,

presumably having been put on notice that an incident would ensue. Immediately afterwards,

rather than launching an investigation to determine whether the Hotel's employees had falsely

accused Plaintiff Laroussi of terrorist activities, HR Director Pratt and GM Tormey instead

called Plaintiff Laroussi into the Banquets office with Plaintiff Z. Ghaouta as union steward.

They informed Plaintiff Laroussi that they had received complaints about him and were therefore

going to suspend him, pending an investigation into those complaints. The Hotel suspended

Plaintiff Laroussi for one week. During this time, management asked Plaintiff Benkirane to sign

a statement saying Plaintiff Laroussi hugged Manager Torres, but Plaintiff Benkirane refused, as

he had witnessed no such incident.

125.    Plaintiff Laroussi had no history of violent behavior, and the Hotel never provided

credible corroboration of the assertion that he had threatened to commit violent acts against the

Hotel. Indeed, during arbitration of this matter, HR Director Pratt admitted, "We were not in a

position to evaluate whether the comments were serious or not," and "We were sensitive . . . to

the events of September 11th," thus admitting that Hotel management had associated Plaintiff

Laroussi with terrorists. During arbitration, Server Campbell also admitted that he and HR

Director Pratt had several conversations over the course of years that Plaintiff Laroussi might

"manufacture something" that would cost Campbell his job. During arbitration, GM Tormey

admitted that the source of complaints about Plaintiff Laroussi had originated from Servers

Campbell and Valdez, and from Food and Beverages Director Compagnon, Banquets Director

Shanahan, and Manager Torres, each with a history of harassing not only Plaintiff Laroussi, but

other Plaintiffs as well. GM Tormey also admitted that although he had spoken to Manager

Torres and Server Campbell – each with known histories of animosities toward Plaintiff Laroussi and other Plaintiffs – about the incident, GM Tormey failed to speak with Plaintiff Laroussi to get his side of the story prior to terminating him.

126.    The following Thursday, November 15, 2007, Plaintiff Laroussi received a call from HR Director Pratt who told him that he should not report to the Hotel again and that he would receive all of the information that he needed by mail.  Several days later, Plaintiff Laroussi received notice that his employment at the Hotel was terminated.

127.    Immediately after Plaintiff Laroussi's termination in November 2007, the Hotel implemented its new Café Crew rotation wheel, assigning each crewmember to work Plaintiff Laroussi's assigned functions until they were completed.  This eliminated the afternoon shift, which Plaintiff Laroussi had worked alone for years, despite his countless complaints about the distribution of work that unfairly burdened him.

128.    On July 21, 2008, after a very difficult pregnancy, Plaintiff Z. Ghaouta's wife delivered their daughter.  In accordance with his faith and while he was on paternity leave, Plaintiff Z. Ghaouta grew a goatee to give thanks to Allah for seeing his family through the difficult pregnancy.  According to Hotel policy, employees are permitted to have facial hair as long as the facial hair is not growing in while the employee is working.  Plaintiff Z. Ghaouta did not grow his goatee in while working.  Instead, he grew his goatee while on leave, and, when he returned, he had a full goatee that was compliant with company policy.  Upon his return, on July 30, 2008, Restaurant Manager Andrea Mitsch approached Plaintiff Z. Ghaouta and told him that she wanted him to shave his beard.  Plaintiff Z. Ghaouta explained to her that he had grown his beard for religious reasons, and he requested a religious accommodation.  Restaurant Manger Mitsch agreed to Plaintiff Z. Ghaouta's request and allowed him to keep his beard.  However, the

following day, Food and Beverage Director Compagnon approached Plaintiff Z. Ghaouta to tell him to shave his beard. Plaintiff Z. Ghaouta again explained why he had allowed his beard to grow in. Ironically, all of the seven or eight people working in the department had facial hair. Accordingly, Plaintiff Z. Ghaouta asked Director Compagnon why he was being singled out and said, "Look at Amazon, Kenny, Albert . . . ," referring to their facial hair. Director Compagnon then falsely claimed that Plaintiff Z. Ghaouta's was not fully grown in and was therefore not comparable to the others, yet his facial hair was equal in length to the other employees. Following the conversation with Director Compagnon, Plaintiff Z. Ghaouta emailed HR Director Pratt, requesting a religious accommodation. The following day, HR Director Pratt called a meeting with Director Compagnon and Plaintiff Z. Ghaouta, during which Pratt insisted that Plaintiff Z. Ghaouta shave his facial hair. After Plaintiff Z. Ghaouta refused, HR Director Pratt suspended him for five days, falsely claiming that his facial hair was not fully grown. Plaintiff Z. Ghaouta filed a grievance with the union on July 31, 2008. It went to the first and second step, at which point GM Tormey said to Plaintiff Z. Ghaouta, "This has nothing to do with religion. I want you to just drop it."

129.    In the summer of 2008, Plaintiff Z. Ghaouta asked Director Shanahan whether he was going to fill the vacancies in the Banquets Department, to which Shanahan replied, "For a long time Banquets was like the Oakland Raiders of the NFL: I ended [up] with all the bad apples of the hotel and I think I have enough Moroccans on staff for now."

130.    Later in 2008, Peter Shanahan replaced Max Compagnon as Food and Beverages Director.

131.    Plaintiff Z. Ghaouta filed a Charge of Discrimination against the Hotel at the MCAD on November 17, 2008.

132.    After Plaintiff Z. Ghaouta filed an MCAD complaint against the Hotel in November 2008, Food and Beverages Director Shanahan approached him and said in a threatening manner, "You don't want to leave it alone; what do you think you will accomplish?" Then Director Shanahan laughed and said, "You are wasting your time."

133.    On November 18, 2008, Plaintiff Benkirane filed a charge of retaliation against the Hotel with the MCAD.

134.    On one occasion in late 2008 or early 2009, when Plaintiff C. Ghaouta had been folding napkins to prepare his tables, Banquets Manager David (LNU) approached Plaintiff C. Ghaouta and told him that he was "doing nothing" and that he should "go do something," despite the obvious fact that Plaintiff C. Ghaouta had been dutifully preparing his tables for guests. In-Room dining server John (LNU), who was beside Plaintiff C. Ghaouta at the time, was actually "doing nothing" at the time, yet Manager David (LNU) gave John no such direction.

135.    In late 2008, Plaintiff C. Ghaouta received a call from his wife informing him that his daughter was sick. Plaintiff C. Ghaouta, who very rarely left work early due to personal matters, informed Manager Linteau that he needed to leave work due to pressing personal issues. Manager Linteau denied his request to leave early because, as she claimed, she thought that Plaintiff C. Ghaouta wanted to leave simply because he did not want to complete the task he had been working on (breaking down a "station"). However, Plaintiff C. Ghaouta had no history of avoiding tasks at the end of his shifts, so he did not understand why she would accuse him of doing so at that point. Further, Hotel management regularly permitted non-Moroccan employees to leave work early to tend to personal issues. Plaintiff C. Ghaouta stressed to Manager Linteau that it was very important that he leave work. Director Shanahan arrived on the scene and, in front of Linteau and Assistant HR Manager Cassandra Vaughan, Shanahan yelled at Plaintiff C.

Ghaouta in a condescending and enraged tone, telling him to "just go" and informing him that he

was "going to put a [disciplinary] note in his file."  Manager Linteau later told Plaintiff C.

Ghaouta that Director Shanahan, as promised, placed a disciplinary note in his file.

136.    On another occasion in late 2008 or early 2009, Banquets Manager David (LNU)

harassed Plaintiff C. Ghaouta by intentionally mispronouncing his first name, Chakib, by saying

"Habib" and "Chabib" instead, even though Plaintiff C. Ghaouta had told him how to pronounce

his name several times.  On one occasion during that same time period, Banquets Manager David

(LNU) also unfairly assigned Plaintiff C. Ghaouta and two others, who are Haitian and Hispanic,

the task of filling water for the whole Banquets room for a large event, which unfairly distracted

them from preparing for their guests.  There were approximately twenty servers on duty, yet the

manager only assigned the extra tasks to these few workers.  Most of the other workers were

U.S.-born.  Later that day, Plaintiff C. Ghaouta went to Food and Beverages Director Shanahan

and accused Shanahan of having ordered Banquets Manager David (LNU) to unfairly assign

onerous tasks to him.  Director Shanahan did not deny Plaintiff C. Ghaouta's allegations; instead,

he accused Plaintiff C. Ghaouta of "causing trouble."

137.    In June 2009, Plaintiff C. Ghaouta's newest manager-in-training, Emily (LNU),

yelled at Plaintiff C. Ghaouta, criticizing how he had been serving a particular table.  The

manager's complaints were unfounded, as Plaintiff C. Ghaouta had been performing his job in

the appropriate manner.  Plaintiff C. Ghaouta calmly tried to explain what he had been doing, but

the manager took exception to the fact that Plaintiff C. Ghaouta had tried to explain himself and

further yelled at Plaintiff C. Ghaouta, "You don't respect me."  At that point, fearing further

escalation of his manger's temper, Plaintiff C. Ghaouta did not say anything.  The manager did

not talk to Plaintiff C. Ghaouta for one week after that incident.

138.    In the summer of 2009, Front Desk Managers Sally Schoeller and Kristen Stabile began taking Saturday shifts away from Plaintiff Amara, to which Plaintiff Amara had been assigned since 2005. To do so, they had likely received approval from Front Desk Manager Tamara Dapic. The Hotel assigned the Saturday shift to Doorman Klein, who admitted to Plaintiff Amara that he thought the scheduling change was unfair. The Hotel also assigned the Tuesday shift to Doorman Flahnery, which Plaintiff Amara had been working. Whereas the standard employee schedule includes five shifts per week, as of July 2009, Plaintiff Amara only worked four shifts per week. One employee, Oscar Guerrero, worked six shifts per week, which violates the Union's Collective Bargaining Agreement provision barring employees from picking up overtime work when other employees do not have full-time work. Although Assistant Manager Schoeller told Plaintiff Amara that he could not take Doorman Klein's newly assigned shift, even though Plaintiff Amara had seniority over Klein, the Hotel allowed Doorman Flahnery to take Plaintiff Amara's Tuesday shift.

139.    On July 6, 2009, Plaintiff Amara filed a Charge of Discrimination with the MCAD.

140.    On July 16, 2009, GM Paul Tormey called Plaintiff Amara into his office and yelled at him, "What's going on with you guys?," and "What the fuck is wrong with you guys? You're going to MCAD? Do you have a problem with me?" Frightened, Plaintiff Amara responded to GM Tormey, "I don't have a problem with you; I have a problem with your management." GM Tormey sarcastically said to Plaintiff Amara, "Thank you for your support." Plaintiff Amara responded, "You're welcome." GM Tormey subsequently met with Plaintiff Z. Ghaouta, repeated what he said to Plaintiff Amara and added, "I do not believe this is a case of discrimination," and he said, "You all are just trying to make the hotel lose money."

141.    Because of a slow down in work in 2009, Plaintiff Amara took on more bellman shifts.  Whenever Plaintiff was off the floor, Assistant Manager Sally Schoeller would ask Bell Captain Doherty where Plaintiff Amara was, as if she suspected that Plaintiff Amara was shirking his responsibilities or engaging in some kind of wrongdoing.  When other doormen were off the floor or were otherwise away from the Front Desk area, Assistant Manager Schoeller would not be so suspicious.

142.    In its campaign against Plaintiff Amara, the Hotel unfairly altered his seniority. Among the doormen, Oscar Guerrero began working in 1993, Plaintiff Amara began in 1995, followed by Flahnery later in 1995, and finally Klein in approximately 1999.  However, despite the fact that Plaintiff Amara has worked at the Hotel for a longer duration than Flahnery or Klein, the Hotel has in effect treated each of them as if he had more seniority than Plaintiff Amara.

143.    On Saturday, July 11, 2009, because of the constant schedule changes, Plaintiff Amara was late to work for the first time in his fourteen years at the Hotel.  According to his new schedule, he was supposed to be at work at 7:00 am; under his old schedule his shift had started at 11:00 am.  Front Desk Manager Kristin Stabile called Plaintiff Amara at 7:15 am to ask why he was not at work, and Plaintiff Amara arrived to work by 7:30am.  Through his many years at the Hotel, Plaintiff Amara was never late to work, and his fellow employees were frequently late, so his tardiness on this one occasion should not have caused any alarm.  However, after Plaintiff Amara started his shift, Manager Stabile told him that he had to go home because she had called another employee to come in to cover his shift.  Her directions violated union rules.  Under the Collective Bargaining Agreement, even if an employee arrived to work late, if the late employee arrived prior to an employee who had been called in to cover that late employee's shift, the Hotel

must still allow the late employee to work his or her shift. The Hotel did not allow Plaintiff Amara, who had never been late, to work his shift, and instead sent him home without pay.

144. Plaintiff Amara had witnessed other employees arriving late to work without recourse for years. The day after the above incident, July 12, 2009, Bellman Bobby White came in about 45 minutes late, yet the Hotel did not send him home or otherwise discipline him. Shortly afterwards, John Flahnery arrived four hours late for his 7 am shift, arriving at 11 am, but the Hotel did not punish him. The following day, July 13, 2009, Bellman Tyrone arrived more than fifteen minutes late. On that day, Plaintiff Amara said to Manager Stabile, "Tyrone was late," but Stabile said nothing and just smiled instead. On July 19, 2009, Bobby White arrived late again, but Front Desk Assistant Manager Stephanie (LNU) merely said "Bobby I thought you weren't coming in; don't worry about it you're okay." On July 26, Bobby White arrived late once again, but the Hotel took no disciplinary action against him.

145. On July 27, 2009, the Bell Captain on duty was very busy and asked Plaintiff Amara for assistance with a Hotel guest. He gave the guest ticket to Plaintiff Amara, but Director Dapic intervened, grabbing the ticket from Plaintiff Amara's hand, and said in a very angry manner, "No, I'm not going to give it to Ahmed." Instead, Director Dapic gave the ticket to someone in the Concierge Department. Fellow employee Doherty witnessed this exchange.

146. In addition to taking away his shifts, the Hotel has prevented Plaintiff Amara from working the St. James Street entrance, which he prefers. Assistant Manager Sally Schoeller told Plaintiff Amara that she did not want him to rearrange his schedule with other employees to suit his preferences. However, while denying Plaintiff Amara's request to switch shifts and entrance assignments with Moroccan Bellman Mohammed Chaib, Assistant Manager Schoeller has

allowed other white Americans, including Michael Collins and Michael Eades, to switch hours and street assignments.

147.    On September 7, 2009, Server Roubini did not report to work as scheduled.  The following Sunday, September 13, 2009, Roubini told Manager Andrea Mitsch that he was on the schedule for September 7, 2009, that he worked September 7, 2009, and insisted on claiming his tips.  Upon realizing that Roubini had been scheduled to work that Sunday, but that he did not show up, Manager Mitsch failed to discipline Roubini in any capacity.  Observing this interaction, Plaintiff C. Ghaouta inquired, "Why these double standards?," as he knew that whenever a Moroccan employee was late he would receive no such preferential treatment. Manager Mitsch became agitated by these inquiries.  To Plaintiff C. Ghaouta's knowledge, the Hotel did not discipline Roubini, even though a no-show, according to the Hotel's rules, should have been the basis for substantial discipline.  Plaintiff C. Ghaouta did not necessarily want the Hotel to discipline Roubini, but he wanted at least an explanation of the Hotel's disparate disciplinary practices.

148.    In early September 2009, before the schedule was posted, Plaintiff Amara asked Manager Stabile for Sunday, September 20 off, as it was a Muslim holiday.  Stabile stated that she could not find anyone to cover the shift, but that she would let him come in late.  Stabile told Plaintiff Amara, "Go pray and come back."

149.    In early September 2009, Plaintiff Amara tried to switch his shift but was denied the request because he asked for the switch on Thursday, and the Hotel policy is that when the schedule is posted an employee must switch shifts no later than Wednesday.  Considering this policy, Plaintiff Amara had no problem with the denial of his request to switch shifts.  However, three weeks later, Plaintiff Amara was scheduled to work on September 30, 2009, at 7:00 am, but

on Saturday, September 26, 2009, Manager Tamara Dapic told Plaintiff Amara he was losing his shift because Oscar requested a shift change. Plaintiff Amara said that he could not lose another shift as the Hotel had already taken too many shifts away from him. Plaintiff Amara asked Manager Dapic whether Oscar requested the shift change before Wednesday. Manager Dapic falsely told Plaintiff Amara that he had, but Plaintiff Amara soon discovered that Oscar requested the change on Thursday, which was in violation of the Hotel policy. As a result of the shift change, Plaintiff Amara lost wages and tips.

150.    In September 2009, Assistant GM Tracey Lowe refused to charge the full gratuity on a function in the Wine Room where both Plaintiffs Z. Ghaouta and C. Ghaouta were working, which caused them a loss of gratuities.

151.    Also in September 2009, Plaintiff Z. Ghaouta was trying to clarify an order to the Oak Room Chef Aldo Mendoza. Chef Mendoza had an unfortunate accident a few months earlier wherein he severely injured his ankle, thus rendering him barely able to move without the aid of a cane. Therefore, Plaintiff Z. Ghaouta approached Chef Mendoza "behind the line" in the kitchen area where the Chef was preparing food, as it is common that a server or a manager would go behind the line to help. In the meantime Assistant GM Lowe walked into the kitchen and yelled at Plaintiff Z. Ghaouta for being behind the line. Plaintiff Z. Ghaouta tried to explain that he was attempting to help Chef Mendoza, but Ms. Lowe continued to yell at Plaintiff Z. Ghaouta.

152.    As a result of these and other discriminatory acts, Plaintiffs have suffered severe humiliation and emotional distress, as well as lost wages and tips.

## COUNT I
### Discriminatory Hostile Work Environment
### 42 U.S.C. §§ 2000e et seq.
### (All Plaintiffs)

153.    Plaintiffs repeat and reallege Paragraphs 1 through 152 of this Complaint.

154.    By their above described conduct, Defendants subjected Plaintiffs individually and collectively to a discriminatory hostile work environment through a pattern of severe or pervasive harassment and by treating Plaintiffs differently from similarly situated U.S.-born employees in the terms and conditions of their employment, all because of their national origin and religion in violation of 42 U.S.C. §§ 2000e et seq.  Defendants' supervisors and managers participated in, condoned, and/or knew or should have known about the discriminatory hostile environment, yet failed to take any effective remedial action.

155.    As referenced throughout this Complaint, the acts of harassment that contributed to the discriminatory hostile environment included, but are not limited to:  accusing Plaintiffs of being involved with the terrorist attacks of September 11, 2001, being terrorists or planning terrorist activities (¶¶ 18, 31); mocking religious practices (¶ 19); taunting Plaintiffs Benkirane, Laroussi, and Z. Ghaouta after the capture of Saddam Hussein, saying, "They caught your uncle." (¶ 43); questioning Plaintiff Z. Ghaouta's patriotism and loyalty (¶ 43); derogatory commentary about Moroccan immigrants in France (¶ 51); selectively sending out immigration update letters to all Moroccan employees, including Plaintiffs despite the fact that they had permanent residence status or full citizenship (¶ 29); threatening to call immigration (¶ 17); requesting Plaintiff Amara's passport despite the fact he previously provided it on several occasions (¶ 52); regularly referring to Plaintiff C. Ghaouta as a member of the "Taliban" and calling him "Chakib Taliban" (¶¶ 54, 107); making comments about  Moroccan employees who took religious holidays off: ("They are going to bomb the Hotel.") (¶ 107); accusing Plaintiff

Tourabi of being in a "sleeper cell" (¶ 30, 59); telling Plaintiff Tourabi, "Be careful at the airport because the FBI is watching all the Arabs." (¶ 83); falsely accusing and terminating Plaintiff Laroussi for an unsubstantiated claim of terrorist activity (¶¶ 124, 125, 126); swearing and yelling at Plaintiff Amara while referencing his religion (¶ 15); telling Plaintiffs to go back their country (¶¶ 31, 45); physically assaulting Plaintiff Amara (¶ 15); allowing an intruder that physically attacked Plaintiff Laroussi to leave premises without obtaining identifying information (¶ 120); falsely accusing Plaintiffs of slacking off (¶¶ 15, 135); falsely accusing Plaintiff Laroussi of threatening behavior (¶¶ 36, ¶ 124); falsely accusing Plaintiff Amara of stealing customer's money (¶ 60); falsely accusing Plaintiff C. Ghaouta of theft (¶ 67); taking disciplinary action against Plaintiff Z. Ghaouta for unauthorized absence on days he was actually present (¶ 53); failing to interview Plaintiff Farouk for a position for which he was qualified(¶ 72); falsely accusing Plaintiff Farouk of missing three days (¶ 74); threatening Plaintiff Z. Ghaouta to withdraw MCAD complaint ("You guys don't want to learn. There is no affirmative action for you guys. Keep challenging me. Don't forget who you work for.") (¶ 80); falsely accusing Plaintiff Laroussi of eating a guest's food (¶ 86); telling other employees to stay away from Moroccan employees (¶ 102); GM Tormey's yelling at Plaintiff Amara for filing discrimination complaint: ("What's going on with you guys?," and "What the fuck is wrong with you guys? You're going to MCAD? Do you have a problem with me?") (¶ 140); failing to investigate claims of harassment based on national origin (¶¶ 17, 43); and failing to discipline non-Moroccan employees for harassment based on national origin (¶¶ 17, 43, 59, 61, 83,);

156.    As referenced throughout this complaint, the acts of disparate treatment that contributed to the discriminatory hostile environment included, but are not limited to: disproportionately assigning better shifts to less senior non-Moroccan employees (¶ 138); the

Hotel's assigning of more shifts and better assignments to less senior non-Moroccan employees than it did to Plaintiffs (¶ 138); denying Plaintiffs' transfer requests (¶¶ 21, 55, 65) and promoting or hiring less senior and less qualified employees (¶¶ 56, 65); downplaying the offensive conduct of non-Moroccan employees (¶¶ 62, 90); questioning and/or disciplining the Plaintiffs about breaks, yet failing to do so when non-Moroccan employees took their own breaks (¶¶ 23, 135); giving Plaintiffs heavier workloads than other non-Moroccan and non-Arab employees (¶¶ 20, 24, 78); questioning and/or disciplining the Plaintiffs for allegations of misconduct, yet consistently failing to discipline non-Moroccan employees for inappropriate behavior and violations of hotel policies, rules and standards, (¶¶ 15, 17, 18, 33, 34, 36, 50, 58, 59, 61, 76, 99, 112, 113, 120, 128, 134, 135, 144); denying Plaintiffs' requests for transfer or promotion, and  instead consistently selecting less senior, less experienced, or external candidates (¶¶ 21, 55, 56, 65, 72); denying Plaintiff Amara's request to switch shifts or hotel entrances where he was stationed to work, yet granting other non-Moroccan employees' requests to switch shifts and assignment locations (¶ 146); aggressively yelling at Plaintiff Tourabi, ordering him to work despite the presence of idle non-Moroccan employees (¶ 116); placing a disciplinary note in Plaintiff C. Ghaouta's file for leaving early to deal with a pressing personal issue, despite the fact other non-Moroccan employees frequently left, without consequences, to deal with pressing personal matters (¶ 135).

157.    Plaintiffs have each suffered severe distress in and out of the workplace as a result of the discriminatory hostile work environment that Defendants created and tolerated.

158.    Plaintiffs seek compensatory and punitive damages to compensate for the harm they have suffered as a result of the unlawful discrimination, as well as attorneys' fees and costs.

## COUNT II
### Discriminatory Hostile Work Environment
### M.G.L. c. 151B, § 4
### (All Plaintiffs)

159.    Plaintiffs repeat and reallege Paragraphs 1 through 158 of this Complaint.

160.    By their above described conduct, Defendants subjected Plaintiffs individually and collectively to a discriminatory hostile work environment through a pattern of severe or pervasive harassment and by treating Plaintiffs differently from similarly situated U.S.-born employees in the terms and conditions of their employment all because of their national origin and religion in violation of M.G.L. c. 151B, § 4. Defendants' supervisors and managers participated in, condoned and/or knew or should have known about the discriminatory hostile environment, yet failed to take any effective remedial action.

161.    These acts of retaliation include, but are not limited to, those instances referenced in Count I of this Complaint, supra.

162.    Plaintiffs have each suffered severe distress in and out of the workplace as a result of the discriminatory hostile work environment that Defendants have created.

163.    Plaintiffs seek compensatory and punitive damages to compensate for the harm they have suffered as a result of the unlawful discrimination, as well as attorneys' fees and costs.

## COUNT III
### Discriminatory Termination
### 42 U.S.C. §§ 2000e et seq.
### (Plaintiffs Farouk and Laroussi)

164.    Plaintiffs repeat and reallege Paragraphs 1 through 163 of this Complaint.

165.    By their above described conduct, Defendants terminated Plaintiff Farouk's employment because of his national origin and religion in violation of 42 U.S.C. §§ 2000e et seq. Defendants claim that Plaintiff Farouk was terminated for making false accusations about a

fellow employee, yet numerous U.S.-born employees made false accusations about Plaintiffs without being terminated or even disciplined for making such false accusations. (¶¶ 15, 28, 36, 67, 73, 76, 93, 124-125.)

166.    By their above described conduct, Defendants terminated Plaintiff Laroussi because of his national origin and religion in violation of 42 U.S.C. §§ 2000e et seq. Defendants knew or should have known that the accusation that Plaintiff Laroussi threatened to commit acts of terrorism against the Hotel was blatantly false and unsubstantiated and the product of biased fellow employees and managers. (¶¶ 124-126.)

167.    Plaintiffs Farouk and Laroussi have each suffered economic harm in the form of lost back pay and front pay, as well as severe distress in and out of the workplace as a result of the their discriminatory terminations.

168.    Plaintiffs Farouk and Laroussi seek compensatory and punitive damages to compensate for the harm they have suffered as a result of the unlawful discrimination, as well as attorneys' fees and costs.

### COUNT IV
### Discriminatory Termination
### M.G.L. c. 151B, § 4
### (Plaintiffs Farouk and Laroussi)

169.    Plaintiffs repeat and reallege Paragraphs 1 through 168 of this Complaint.

170.    By their above described conduct, Defendants terminated Plaintiff Farouk's employment because of his national origin and religion in violation of M.G.L. c. 151B, § 4. Defendants claim that Plaintiff Farouk was terminated for making false accusations about a fellow employee, yet numerous U.S.-born employees made false accusations about Plaintiffs without being terminated or even disciplined for making such false accusations. (¶¶ 15, 28, 36, 67, 73, 76, 93, 124-125.)

171.    By their above described conduct, Defendants terminated Plaintiff Laroussi because of his national origin and religion in violation of M.G.L. c. 151B, § 4. Defendants knew or should have known that the accusation that Plaintiff Laroussi threatened to commit acts of terrorism against the Hotel was blatantly false and unsubstantiated and the product of biased fellow employees and managers. (¶¶ 124-126.)

172.    Plaintiffs Farouk and Laroussi have each suffered economic harm in the form of lost back pay and front pay, as well as severe distress in and out of the workplace as a result of the their discriminatory terminations.

173.    Plaintiffs Farouk and Laroussi seek compensatory and punitive damages to compensate for the harm they have suffered as a result of the unlawful discrimination, as well as attorneys' fees and costs.

**COUNT V**
**Retaliation**
**42 U.S.C. §§ 2000e et seq.**
**(All Plaintiffs)**

174.    Plaintiffs repeat and reallege Paragraphs 1 through 173 of this Complaint.

175.    By their above described conduct, Defendants subjected Plaintiffs to retaliation and a retaliatory hostile work environment because they individually and collectively engaged in protected activities, such as complaining to management, filing union grievances about disparate treatment and harassment, and lodging discrimination complaints with the MCAD/EEOC in violation of 42 U.S.C. §§ 2000e et seq.

176.    As referenced throughout this complaint, the acts of retaliation include, but are not limited to, those described in Count I above as well as: the Hotel's falsely accusing Plaintiff Amara of taking more than his share of work for tips after he filed a complaint with the MCAD (¶ 39); management's giving Plaintiff Z. Ghaouta unfavorable work assignments after he

complained to HR about inappropriate comments that a non-Moroccan employee made (¶ 44); disciplining Plaintiff C. Ghaouta for reporting a manager's discriminatory comments (¶ 50); GM Crellin's telling Plaintiffs Laroussi and Tourabi that he did not want to hear complaints about past incidents and implying that the Hotel would take further action those who complain (¶ 69); the Hotel's assigning Plaintiff Tourabi more work after several Plaintiffs signed a petition regarding the hostile work environment (¶ 78); HR director Pratt's approaching Plaintiff Z. Ghaouta to ask him to convince Plaintiff Farouk to withdraw his MCAD complaint and implying adverse actions would be taken for continued pursuit of discrimination claims (¶ 80); GM Tormey's questioning Plaintiff Amara in an aggressive manner about the MCAD complaint that Plaintiff Amara filed (¶ 140); the front desk manager's taking shifts away from Plaintiff Amara that he had consistently held since 2005 (¶ 138); and Defendants termination of Plaintiffs Farouk (¶ 94) and Laroussi (¶ 126).

177. Plaintiffs seek compensatory and punitive damages to compensate for the unlawful retaliation they have suffered, as well as attorneys fees, costs, and other such remedies that this Court deems appropriate.

**COUNT VI**
**Retaliation**
**M.G.L. c. 151B, § 4**
**(All Plaintiffs)**

178. Plaintiffs repeat and reallege Paragraphs 1 through 177 of this Complaint.

179. By their above described conduct, Defendants subjected Plaintiffs to retaliation and a retaliatory hostile work environment because they individually and collectively engaged in protected activities, such as complaining to management, filing union grievances about disparate treatment and harassment, and lodging discrimination complaints with the MCAD/EEOC in violation of M.G.L. c. 151B, § 4.

180.    These acts of retaliation include, but are not limited to, those instances referenced in Count V of this Complaint, supra.

181.    Plaintiffs seek compensatory distress and punitive damages to compensate for the unlawful retaliation they have suffered, as well as attorneys' fees and costs.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully requests the following relief:

a.    Compensatory damages in the form of back pay and front pay in an amount determined by a jury;

b.    Emotional distress damages in an amount determined by a jury;

c.    Punitive damages in an amount determined by a jury;

d.    Equitable relief by this Court, including but not limited to a court order requiring Defendants (1) to cease their discriminatory behavior,  (2) to provide quality and effective in-person training to their management and supervisors and to any employees who have been or in the future are found to have made discriminatory statements engaged in discriminatory behavior, (3) to report any future complaints alleging discrimination on the basis of national origin or religion to a designated entity for the purpose of monitoring compliance with this Court's order, and (4) such other equitable relief as this Court deems appropriate;

e.    Costs and attorneys fees;

f.    Such other and further relief as this Court deems appropriate.

**PLAINTIFFS DEMAND A TRIAL BY JURY**

Respectfully submitted,


/s/ Jody L. Newman
_____
Jody L. Newman (B.B.O. #542264)
Dwyer & Collora, LLP
600 Atlantic Avenue, 12th Floor
Boston, MA 02210-2211
jnewman@dwyercollora.com
(617) 371-1006 (telephone)
(617) 371-1037 (facsimile)


/s/ Rahsaan D. Hall
_____
Rahsaan D. Hall (B.B.O # 645369)
rhall@lawyerscom.org
Michael Aleo (B.B.O # 672071)
maleo@lawyerscom.org
Lawyers' Committee for Civil Rights
294 Washington Street, Suite 443
Boston, MA 02108
(617) 988-0608 (telephone)
(617) 482-4392 (facsimile)

Attorneys for Plaintiffs

Dated:  October 26, 2009